UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| IN RE AMAZON.COM, INC. SHAREHOLDER DERIVATIVE LITIGATION | Lead Case No. 2:22-cv-00559-JCC (Consolidated with Case No. 2:22-cv-00811-RAJ) |
| ----------------------------------------- | Shareholder Derivative Action |
| This Document Relates to: | **CONSOLIDATED VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** |
| ALL ACTIONS | |
| | DEMAND FOR JURY TRIAL |

Plaintiffs Stephen G. Nelson and Francis Gimbel, Jr. ("Plaintiffs"), by and through undersigned counsel, submit this Consolidated Verified Stockholder Derivative Complaint for breach of fiduciary duties, corporate waste, and unjust enrichment. Plaintiffs allege the following based on personal knowledge, and as to all other matters outside Plaintiffs' personal knowledge, upon information and belief based on the investigation of undersigned counsel, which includes, without limitation: (i) review and analysis of public filings with the United States Securities and Exchange Commission ("SEC"); (ii) review and analysis of court filings in (a) the related consolidated securities class action lawsuit filed against Amazon.com, Inc. ("Amazon" or the "Company") and certain of its executive officers captioned *Joyce v. Amazon, Inc. et al.*, No. 2:22-cv-617 (W.D. Wash.) (the "Securities Class Action"); (b) consumer class action lawsuits and government enforcement actions alleging violations of, *inter alia*, the Illinois Biometric Information Privacy Act, 740 ILCS 14/1 *et seq.* ("BIPA"), and other state privacy laws

(collectively, the "Consumer Privacy Actions");[1] (c) lawsuits and enforcement actions alleging violations of antitrust laws; and (iii) review and analysis of press releases, news reports, analyst reports, industry reports, investor conference call transcripts and slides, and other information available in the public domain.

## I.    INTRODUCTION

1.    This is a stockholder derivative action brought on behalf of and for the benefit of Amazon, against certain of its current and former officers and directors (the "Individual Defendants," defined herein), seeking to remedy their breaches of fiduciary duties, waste of corporate assets, and unjust enrichment, which have caused substantial economic and reputational harm to the Company.

2.    Amazon is a leading multinational technology company, specializing in e-commerce, cloud-based services, and artificial intelligence.  According to its public filings, Amazon "seek[s] to be Earth's most customer-centric company."  Amazon was founded in 1994 and is headquartered in Seattle, Washington.  Its common stock trades on the NASDAQ under the ticker symbol "AMZN."

3.    Throughout the relevant period, the Individual Defendants breached their fiduciary duties owed to the Company in a multitude of significant ways.

---

[1] Specifically, the Consumer Privacy Actions include:  *Williams v. Inpax Shipping Solutions, Inc., et al.*, No. 2018-CH-02307 (Cir. Ct. of Cook Cnty., Ill.); *Wilcosky v. Amazon.Com, Inc., et al.*, No. 1:19-cv-05061 (N.D. Ill.) (as well as actions consolidated with it); *McGoveran v. Amazon Web Services, Inc., et al.*, No. 1:20-cv-01399 (D. Del.); *Federal Trade Commission v. Ring, LLC*, No. 1:23-cv-01549 (D.D.C.);  *In re: Ring LLC Privacy Litigation*, No. 2:19-cv-10899-MWF-RAO (C.D. Cal.); *Wise v. Ring, LLC*, No. 2:20-cv-01298-JCC (W.D. Wash.); *Redd v. Amazon.com, Inc., et al.*, No. 1:20CV06485 (N.D. Ill.); *Garner v. Amazon.com, Inc.*, No. 2:21-cv-00750-RSL (W.D. Wash.); *Hogan v. Amazon Inc.*, No. 2:21-cv-00905 (W.D. Wash.); *Schaeffer v. Amazon.com, Inc., et al.*, No. 3:21-cv-01080 (S.D. Ill.); *Svoboda v. Amazon.com Inc., et al.*, No. 1:21CV05336 (N.D. Ill.); *Mayhall v. Amazon Web Services Inc., et al.*, No. 2:21CV01473 (W.D. Wash.); *Jones v. Whole Foods Market Group, Inc.*, No. 1:22-cv-01389 (N.D. Ill.); *Dorian v. Amazon Web Services, Inc.*, No. 2:22-cv-00269 (W.D. Wash.); *Trio v. Amazon Web Services, Inc.*, No. 1:23-cv-01389 (N.D. Ill.); *Perry v. Amazon Logistics, Inc.*, No. 1:23-cv-03383 (N.D. Ill.); *Thompson v. Amazon.com, Inc.*, 1:23-cv-03717 (N.D. Ill.); over 75,000 consumer arbitrations concerning violations of privacy by Amazon's Echo product; a €746 million fine by the Luxembourg National Commission for Data Protection for Amazon's violations of the European Union's General Data Protection Regulation ("GDPR") (July 16, 2021); and a €35 million fine for GDPR violations because the Amazon.fr site deposited cookies on visitors' computers without consent (Dec. 7, 2020).

4. First, the Individual Defendants breached their fiduciary duties owed to the Company by knowingly and/or recklessly causing the Company to violate privacy laws and regulations, as described in detail herein, by storing the biometric information of its employees, users, cloud-based clients' users, and others, including minors, without informing them of these practices, without securing written consents required by law, and without a publicly available written policy that set a retention schedule and guidelines for users to permanently destroy biometric identifiers.

5. Second, the Individual Defendants further breached their fiduciary duties and violated the law by causing the Company to engage in various anticompetitive practices on its e-commerce platform, including (i) causing the online retailer to enter into contracts with Third Party Sellers ("TPSs") that have the effect of inflating prices for consumers through policies that guaranteed Amazon a minimum profit on each item sold, while simultaneously discouraging TPSs from offering their products at lower prices through other retailers; and (ii) using TPSs's non-public data to give Amazon's private-label products preference over those competing products.

6. Third, while causing the Amazon to violate privacy and antitrust laws, the Individual Defendants further breached their fiduciary duties by misleading the investing public in the Company's SEC filings and other public statements about the Company's e-commerce business. In particular, the Individual Defendants made or allowed the Company to make misrepresentations regarding two aspects of its e-commerce business: (i) its anticompetitive conduct, including the way Amazon's e-commerce business sells third-party merchandise and its own private-label products, and (ii) Amazon's over-expansion of the infrastructure and fulfillment network for its e-commerce business. As a direct result of improper statements regarding two aspects of Amazon's e-commerce business, the Company is now the subject of a consolidated securities class action filed in the U.S. District Court for the Western District of Washington on behalf of investors who purchased Amazon's shares, *Joyce et al. v. Amazon.com, Inc. et al.*, Case No. 2:22-cv-617 (the "Securities Class Action"). The Securities Class Action asserts claims against Amazon, Jeffrey P. Bezos ("Bezos"), Andrew R. Jassy ("Jassy"), Brian T. Olsavsky ("Olsavsky"), David A. Zapolsky ("Zapolsky"), Nate Sutton ("Sutton"), and David Fildes.

HERMAN JONES LLP
15113 Washington Ave. NE
Bainbridge Island, WA 98110

7. As a consequence of their misconduct described herein, and unbeknownst to the investing public at the time, the Individual Defendants exposed Amazon to heightened risks of increased regulatory scrutiny, government investigations and enforcement actions, and legal exposure the Company would otherwise not been subjected to during the relevant period. Further, the Individuals Defendant's allowed the Company to report revenue numbers that were, in part, the product of impermissible and illegal conduct, and were thus unsustainable at all relevant times.

8. In addition, because of the Individual Defendants' breaches of fiduciary duties detailed herein, the Company has already suffered significant actual damages, including being named as a defendant in the Securities Class Action, Consumer Privacy Actions, and antitrust actions, as well as becoming the subject of a criminal investigation ("Criminal Investigation") by the U.S. Department of Justice ("DOJ") and a government probe into Amazon's public disclosures regarding its business practices by the SEC ("SEC Probe"), and the Company continues to be subjected to mounting damages by failing to redress the harms complained of herein.

9. As fiduciaries for Amazon, the Individual Defendants now face a substantial likelihood of liability to the Company for their misconduct, including, among other things: (i) directly participating in the improper schemes and misconduct described herein; (ii) affirmatively making, allowing to be made, and/or failing to correct improper statements in SEC filings and other public disclosures relating to the Company's business and operations, internal controls, legal proceedings, legal compliance, and risks (including financial, operational, legal, regulatory, and enforcement risks); (iii) failing to maintain an adequate system of oversight, accounting controls and procedures, disclosure controls, and other internal controls, which were necessary to prevent or correct violations of the law and improper statements made on the Company's behalf; (iv) failing to ensure the Company's compliance with relevant legal and regulatory requirements, including, but not limited to, requirements imposed under biometric privacy laws and antitrust laws, as well as state and federal securities laws; and (v) ignoring red flags indicating inadequate internal controls over compliance with biometric privacy laws and antitrust laws, as well as state and federal securities laws, and indicating violations the same.

10. Due to the Amazon Board of Directors' (the "Board") knowledge of illegal conduct

and involvement in the wrongdoing, its blatant failure to act (including to stop or correct violations of the law), its members' lack of independence, and the substantial likelihood of liability its members face, any demand upon the Board to rectify this wrongdoing of the Individual Defendants would be a wasteful, useless, and futile act. Accordingly, Plaintiffs properly bring this action to remedy the harm to Amazon caused by Defendants' faithless actions and inaction.

## II. JURISDICTION AND VENUE

11. This Court has jurisdiction under 28 U.S.C. § 1332. Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interest and costs.

12. This Court has jurisdiction over each named Defendant.

13. Additionally, this Court has specific jurisdiction over each named Defendant herein because each Defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

14. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because: (i) Amazon maintains executive offices in this District; (ii) one or more of the Defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Amazon occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## III. THE PARTIES

**A. Plaintiff**

15. Plaintiff Stephen G. Nelson ("Plaintiff Nelson") was an Amazon stockholder at the time of wrongdoing complained of, has continuously been a stockholder since that time, and is a current Amazon stockholder.

16. Plaintiff Nelson is a citizen of the State of Georgia.

17. Plaintiff Francis Gimbel, Jr. ("Plaintiff Gimbel") was an Amazon stockholder at the time of wrongdoing complained of, has continuously been a stockholder since that time, and is a current Amazon stockholder.

18. Plaintiff Gimbel is a citizen of the Commonwealth of Pennsylvania.

**B. Nominal Defendant**

19. Nominal Defendant Amazon is a publicly traded Delaware corporation with its principal executive offices located at 410 Terry Avenue North, Seattle, Washington.

20. The Company's common stock trades on the NASDAQ under the ticker symbol "AMZN." Amazon has over 10 billion shares of common stock outstanding.

**C. Defendants**

21. Defendant Jeffrey P. Bezos ("Bezos") is the founder and Executive Chair of Amazon's Board of Directors. He served as Chief Executive Officer ("CEO") of the Company from May 1996 to July 2021 and as President from founding until June 1999 and again from October 2000 to July 2021. Throughout the relevant period, Amazon has paid Defendant Bezos the following compensation:

| Year | Salary | Stock Awards | All Other Compensation | Total |
|------|--------|--------------|------------------------|-------|
| 2021 | $81,840 | - | $1,600,000 | $1,681,840 |
| 2020 | $81,840 | - | $1,600,000 | $1,681,840 |
| 2019 | $81,840 | - | $1,600,000 | $1,681,840 |
| 2018 | $81,840 | - | $1,600,000 | $1,681,840 |

22. According to Forbes, Bezos had a net worth of $201 billion in 2021, making him the richest person in America then. In 2022, Forbes listed him as the second richest person in America.

23. Upon information and belief, Defendant Bezos is a citizen of the State of Washington.

24. Defendant Andrew R. Jassy ("Jassy") is the President and CEO of Amazon and also serves on its Board of Directors. He founded Amazon Web Services ("AWS") and served as

CEO of AWS from April 2016 to July 2021.

25.     Throughout the relevant period, Amazon has paid Defendant Jassy the following compensation:

| Year | Salary | Stock Awards | All Other Compensation | Total |
|------|--------|--------------|------------------------|-------|
| 2021 | $175,000 | $211,933,520 | $592,649 | $212,701,169 |
| 2020 | $175,000 | $35,639,068 | $34,381 | $35,848,449 |
| 2019 | $175,000 | - | $173,809 | $348,809 |
| 2018 | $175,000 | $19,466,434 | $91,232 | $9,732,666 |

26.     Upon information and belief, Defendant Jassy is a citizen of the State of Washington.

27.     Defendant Brian T. Olsavsky ("Olsavsky") is the Senior Vice President and Chief Financial Officer of Amazon.  Throughout the relevant period, Amazon has paid Defendant Olsavsky the following compensation:

| Year | Salary | Stock Awards | All Other Compensation | Total |
|------|--------|--------------|------------------------|-------|
| 2021 | $160,000 | - | $3,200 | $163,200 |
| 2020 | $160,000 | $17,010,985 | $3,200 | $17,174,185 |
| 2019 | $160,000 | - | $3,200 | $163,200 |
| 2018 | $160,000 | $6,770,149 | $3,200 | $6,933,349 |

28.     Upon information and belief, Defendant Olsavsky is a citizen of the State of Washington.

29.     Defendant David H. Clark ("Clark") was the chief executive officer of Worldwide Consumer, which, in part, runs all of the functions that enable Amazon to deliver physical goods to customers globally including fulfilment centers, the transportation network, and the customer service organization.  On June 3, 2022, Clark abruptly announced his resignation from Amazon, effective July 1, 2022.  Clark reportedly gave up $77 million in compensation when he resigned, which was weeks before the truth emerged about the e-commerce division he led.  Throughout the relevant period, Amazon has paid Defendant Clark the following compensation:

HERMAN JONES LLP
15113 Washington Ave. NE
Bainbridge Island, WA 98110

| Year | Salary | Stock Awards | All Other Compensation | Total |
|------|--------|--------------|------------------------|-------|
| 2021 | $175,000 | $55,589,120 | $310,451 | $56,074,571 |
| 2020 | $160,000 | $46,121,888 | $6,783 | $46,288,671 |

30.    Upon information and belief, Defendant Clark is a citizen of the State of Texas.

31.    Defendant Shelley L. Reynolds ("Reynolds") is Amazon's Vice President, Worldwide Controller and Principal Accounting Officer.  Upon information and belief, Defendant Reynolds is a citizen of the State of Washington.

32.    Defendant Adam N. Selipsky ("Selipsky") is the Chief Executive Officer of Amazon Web Services.  Throughout the relevant period, Amazon has paid Defendant Selipsky the following compensation:

| Year | Salary | Stock Awards | All Other Compensation | Total |
|------|--------|--------------|------------------------|-------|
| 2021 | $109,722 | $81,294,756 | $49,045 | $81,453,523 |

33.    Upon information and belief, Defendant Selipsky is a citizen of the State of Washington.

34.    Defendant David Zapolsky ("Zapolsky") is Amazon's Vice President, General Counsel and Secretary.  Throughout the relevant period, Amazon has paid Defendant Zapolsky the following compensation:

| Year | Salary | Stock Awards | All Other Compensation | Total |
|------|--------|--------------|------------------------|-------|
| 2021 | $160,000 | - | $3,200 | $163,200 |
| 2020 | $160,000 | $17,010,985 | $3,200 | $17,174,185 |

35.    Upon information and belief, Defendant Zapolsky is a citizen of the State of Washington.

36.    Defendant Keith B. Alexander ("Alexander") has served as a director of the Company since September 2020.  In addition, he also serves as a member of the Audit Committee. Amazon compensated Defendant Alexander at least $934,297 in stock awards in 2020.  Upon information and belief, Defendant Alexander is a citizen of the State of Michigan.

37. Defendant Edith W. Cooper ("Cooper") has served as a director of the Company since September 2021. In addition, she also serves as a member of the Leadership Development and Compensation Committee. Amazon compensated Defendant Cooper at least $958,171 in stock awards in 2021. Upon information and belief, Defendant Cooper is a citizen of the State of Connecticut.

38. Defendant Jamie S. Gorelick ("Gorelick") has served as a director of the Company since February 2012. In addition, she also serves as Chair of the Nominating and Corporate Governance Committee. Amazon compensated Defendant Gorelick at least $938,533 in Stock Awards in 2020 and $952,741 in stock awards in 2018. Upon information and belief, Defendant Gorelick is a citizen of the State of Maryland.

39. Defendant Daniel P. Huttenlocher ("Huttenlocher") has served as a director of the Company since September 2016. In addition, he also serves as a member of the Leadership Development and Compensation Committee. Amazon compensated Defendant Huttenlocher at least $951,489 in stock awards in 2019. Upon information and belief, Defendant Huttenlocher is a citizen of the State of New York.

40. Defendant Judith A. McGrath ("McGrath") has served as a director of the Company since July 2014. In addition, she also serves as Chair of the Leadership Development and Compensation Committee. Amazon compensated Defendant McGrath at least $934,297 in stock awards in 2020. Upon information and belief, Defendant McGrath is a citizen of the State of California.

41. Defendant Indra K. Nooyi ("Nooyi") has served as a director of the Company since February 2019. In addition, she also serves as Chair of the Audit Committee. Amazon compensated Defendant Nooyi at least $901,729 in stock awards in 2019. Upon information and belief, Defendant Nooyi is a citizen of the State of Connecticut.

42. Defendant Jonathan J. Rubinstein ("Rubinstein") has served as a director of the Company since December 2010. In addition, he also serves as Lead Director and as a member of the Nominating and Corporate Governance Committee. Amazon compensated Defendant Rubinstein at least $951,489 in stock awards in 2019. Upon information and belief, Defendant

Rubinstein is a citizen of the State of California.

43. Defendant Patricia Q. Stonesifer ("Stonesifer") has served as a director of the Company since February 1997. In addition, she also serves as a member of the Nominating and Corporate Governance Committee. Amazon compensated Defendant Stonesifer at least $951,489 in stock awards in 2019. Upon information and belief, Defendant Stonesifer is a citizen of the District of Columbia.

44. Defendant Wendell P. Weeks ("Weeks") has served as a director of the Company since February 2016. In addition, he also serves as a member of the Audit Committee. Amazon compensated Defendant Weeks at least $929,992 in Stock Awards in 2019 and at least $999,026 in Stock Awards in 2021. Upon information and belief, Defendant Weeks is a citizen of the State of New York.

45. Defendant Rosalind Brewer ("Brewer") served as a director of the Company from February 2019 until February 16, 2021. Amazon compensated Defendant Brewer at least $929,992 in stock awards in 2019. Upon information and belief, Defendant Brewer is a citizen of the State of Washington.

46. Defendant Thomas O. Ryder ("Ryder") served as a director of the Company from November 2002 until December 31, 2021. In addition, he served as a member of the Leadership Development and Compensation Committee and as Chair of the Audit Committee. Amazon compensated Defendant Ryder at least $951,489 in stock awards in 2019. Upon information and belief, Defendant Ryder is a citizen of the State of Washington.

47. Defendant Nate Sutton ("Sutton") served as Amazon's Associate General Counsel at all relevant times. Upon information and belief, Defendant Sutton is a citizen of the State of Washington.

48. Collectively, Defendants Bezos, Jassy, Olsavsky, Clark, Reynolds, Selipsky, Sutton, and Zapolsky are referred to herein as the "Officer Defendants."

49. Collectively, Defendants Bezos, Jassy, Alexander, Cooper, Gorelick, Huttenlocher, McGrath, Nooyi, Rubinstein, Stonesifer, Weeks, Brewer, and Ryder are referred to herein as the "Director Defendants."

HERMAN JONES LLP
15113 Washington Ave. NE
Bainbridge Island, WA 98110

50. Collectively, Defendants Alexander, Nooyi, Weeks, and Ryder are referred to herein as the "Audit Committee Defendants."

51. Collectively, Defendants Gorelick, Rubinstein, and Stonesifer are referred to herein as the "Nominating and Corporate Governance Committee Defendants."

52. Collectively, Defendants Cooper, Huttenlocher, McGrath, and Ryder are referred to herein as the "Leadership Development and Compensation Committee Defendants."

53. Collectively Defendants Bezos, Jassy, Olsavsky, Clark, Reynolds, Selipsky, Zapolsky, Alexander, Cooper, Gorelick, Huttenlocher, McGrath, Nooyi, Rubinstein, Stonesifer, Weeks, Brewer, Ryder, and Sutton are referred to herein as the "Individual Defendants."

54. Collectively Defendants Bezos, Jassy, Alexander, Cooper, Gorelick, Huttenlocher, McGrath, Nooyi, Rubinstein, Stonesifer, and Weeks are referred to herein as the "Demand Board."

## IV. THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### *Company Background: Amazon is the Dominant Online Marketplace*

55. Founded in 1994, Amazon is now one of the world's largest, most ubiquitous companies, as well as the world's largest retailer outside of China. It is the second largest private employer in the United States and provides products and services including online retail, smart home devices, cloud computing, and media streaming—including its own film and television content. Originally an online book retailer, Amazon quickly expanded into music and videos, and eventually electronics, toys, and other products prior to 2000. Presently, nearly any physical or digital product imaginable can be purchased on Amazon worldwide.

56. Amazon accounts for between 50-70% of total sales through online marketplaces. By comparison, the marketplace shares of the next two largest online marketplaces—Walmart.com and eBay—are in the single digits. Millions of TPSs sell through Amazon's online marketplace, whereas only 110,000 TPSs sell on Walmart.com. In short, Amazon is the dominant online marketplace.

57. Amazon's 55th employee, James Marcus ("Marcus"), revealed the approach of Amazon management to collecting and monetizing other people's data, explaining: "It was made clear from the beginning that data collection was also one of Amazon's businesses." Marcus added

that "***all customer behavior that flowed through the site was recorded and tracked, and that that itself was a commodity***." *See* https://www.pbs.org/wgbh/frontline/interview/james-marcus/. Mr. Marcus's statement is prescient.

58. As discussed below, the Individual Defendants caused and/or allowed the Company to violate privacy laws when monetizing consumers' personal data, to illegally exploit the data of TPSs on its platform in furtherance of their anticompetitive conduct, and misled the investing public in the Company's SEC filings and other public statements about the Company's e-commerce business.

## A. BIOMETRICS AND FACIAL RECOGNITION TECHNOLOGY

59. Further expanding on its retail business, Amazon launched AWS, its cloud-computing subsidiary, in 2002. AWS has since become Amazon's most profitable segment and grown to become the largest cloud computing service provider in the world. Through AWS, Amazon provides a range of services to businesses and individuals including web hosting, storage, distributed computing, and analytics. As part of the more than 200 services provided to its customers, AWS regularly receives, processes, and stores personal information, including biometrics, of various individuals and then provides this information to its customers.

60. Biometrics are distinctive, measurable characteristics used to label and describe individuals. One technological application of biometrics is facial recognition software. Facial recognition software uses biometric identifiers to map facial features from a photograph or video. Specifically, the software uses an algorithm that calculates a unique digital representation of the face based on the geometric relationship of a person's facial features (such as the distance between their eyes, ears, and nose), creating a face signature or map. The software then compares the information with a database of known faces to find a match.

61. Facial recognition technology is primarily used for three different types of applications: first, facial recognition technology can anonymously characterize faces. This allows for counting unique faces presented to the sensor over a period of time (sometimes called a "people counter"). Other functions include estimating the age, gender, ethnic origin, and even body mass index of each unique face thus encountered, usually for marketing purposes. Second, facial

recognition technology can verify a face against a known image. For example, this would allow for confirmation that a face presented at a border checkpoint matches the digital face embedded in a document. It also allows for access control, such as at the entrance of a building with a known and restricted population. This function is typically called "verification." Third, facial recognition technology allows for identification of a face against a number of known faces within a database. For example, this allows for the technology to see if a criminal or terrorist in a surveillance video matches any mug shot photos of people previously arrested or convicted. This function is typically called "identification."[2]

62. Facial recognition technology has improved over the past decade. Lower costs and increased accuracy have allowed companies like Amazon to deploy increasingly sophisticated facial recognition software in their applications—but it also has raised serious privacy issues.

63. Biometric data presents a significant privacy threat to the individual if the data is compromised, such as a heightened risk for identity theft. While biometrics are touted as a way to improve security and potentially limit fraud, the use of biometrics raise grave concerns about potential constant and surreptitious surveillance of individuals by the government and private entities. Additionally, if a person's biometric data is compromised, the harm could be irreparable. While other types of theft, such as compromising of bank accounts or credit card numbers, can be mitigated by obtaining new account information, people cannot obtain new biometric data facial bone structure or DNA. Additionally, significant privacy concerns surround the use of biometric data. These concerns include employers' ability to discover protected health information; ambiguous standards concerning when biometric information can be shared, including with law enforcement; and multimodal big data storage, in which multiple images and various types of biometrics are stored in a database for widespread use.

64. Due to the growing concern over the use of biometrics and facial recognition technology, state laws, including in Illinois and Texas, prohibit commercial entities from capturing an individual's biometric identifiers without his or her consent. Both states also require businesses

---

[2] "Face Biometrics." IBIA, https://www.ibia.org/biometrics-and-identity/biometric-technologies/face. Accessed July 12, 2023.

HERMAN JONES LLP
15113 Washington Ave. NE
Bainbridge Island, WA 98110

to protect biometrics using a reasonable standard of care that is the same as, or more protective than, that used for other confidential or sensitive information. They also prohibit selling or disclosing biometric data without consent, with certain exceptions, such as for law enforcement purposes. In addition, at least 19 states restrict using, disclosing or sharing biometric data by either public or private entities, or require security measures, such as encrypting or properly destroying records with biometrics. Further, at least 20 states have enacted legislation to protect the personal biometric information of students or minors.

### 1. The Illinois Biometric Information Privacy Act

65. In 2008, the Illinois General Assembly enacted the Illinois BIPA to enhance the state's "limited State law regulating the collection, use, safeguarding, and storage of biometrics[.]" 740 Ill. Comp. Stat. § 14/5(e). BIPA defines a "biometric identifier" as including a "scan of hand or face geometry." 740 Ill. Comp. Stat. § 14/10. The legislature noted that "[b]iometrics are unlike other unique identifiers that are used to access finances or other sensitive information," because while social security numbers can be changed if compromised, biometric data are "biologically unique to the individual," and "once compromised, the individual has no recourse, is at heightened risk for identity theft, and is likely to withdraw from biometric-facilitated transactions." 740 Ill. Comp. Stat. § 14/5(c).

66. BIPA defines "biometric information" as:

> a retina or iris scan, fingerprint, voiceprint, or scan of hand or face geometry. Biometric identifiers do not include writing samples, written signatures, photographs, human biological samples used for valid scientific testing or screening, demographic data, tattoo descriptions, or physical descriptions such as height, weight, hair color, or eye color. Biometric identifiers do not include donated organs, tissues, or parts as defined in the Illinois Anatomical Gift Act or blood or serum stored on behalf of recipients or potential recipients of living or cadaveric transplants and obtained or stored by a federally designated organ procurement agency. Biometric identifiers do not include biological materials regulated under the Genetic Information Privacy Act. Biometric identifiers do not include information captured from a patient in a health care setting or information collected, used, or stored for health care treatment, payment, or operations under the federal Health Insurance Portability and Accountability Act of 1996. Biometric identifiers do not include an X-ray, roentgen process, computed tomography, MRI, PET scan, mammography, or other image or film of the human anatomy used to diagnose, prognose, or treat an illness or other

HERMAN JONES LLP
15113 Washington Ave. NE
Bainbridge Island, WA 98110

medical condition or to further validate scientific testing or screening.

740 ILCS 14/10.

67. Under BIPA, a company may not collect or otherwise obtain a person or a customer's biometric identifier or biometric information without informing the subject in writing and securing a written release. Nor may a company profit from an individual's biometric identifiers and information. Moreover, companies must have a publicly available, written policy establishing a retention schedule for biometric identifiers and information and guidelines for their permanent destruction. BIPA, §§ 14/15(a)–(e).

68. BIPA provides for a private right of action. For negligent violations of the Act, BIPA provides for liquidated damages of $1,000 or actual damages, whichever is greater for each violation; and in the case of intentional or reckless violations, statutory damages in the amounts of $5,000 or actual damages, whichever is greater for each violation. BIPA also provides for reasonable attorneys' fees and costs, including expert witness fees and other litigation expenses, and any other relief, including an injunction, as the state or federal court may deem appropriate. The statute of limitation for BIPA actions is five years, and each transmission in violation of BIPA constitutes a claim.

### 2. Other State Laws Restrict Capture and Use of Biometric Data

69. In 2009, Texas enacted the Capture or Use of Biometric Identifier Act ("CUBI"). CUBI prohibits the capture of an individual's biometric identifiers for a commercial purpose unless the individual is first informed and has consented to such data collection, the. The law also limits the sale or disclosure of an individual's biometric information except under limited circumstances. In the law, "biometric identifier" means a retina or iris scan, fingerprint, voiceprint, or recording of hand or face geometry.

70. A violation of CUBI is subject to a civil penalty of not more than $25,000 for each violation. The attorney general may bring an action to recover the civil penalty. Unlike BIPA, there is no statutory private right of action under the CUBI, but government enforcement for violation of the CUBI poses enforcement risks in the millions of dollars. Therefore, there is

substantial civil exposure for noncompliance.

71.     In 2017, the State of Washington became the third state to enact a targeted biometric privacy law.  Since then, the states of Arkansas, California, Vermont, and New York (as well as New York City) have expanded cybersecurity data breach notification statutes to include protections for biometric data.  Numerous states currently have legislation pending concerning protecting biometric data.

72.     Underscoring the legal risks and magnitude of exposure, Meta Platforms, Inc. (f/k/a Facebook) ("Facebook") recently reached a $650 million settlement for alleged violations of Illinois' BIPA for their use of facial recognition software without permission from affected users. Further, the Texas Attorney General has sued Facebook for alleged violations of the Texas Business and Commercial Code, which contains provisions governing the collection, retention and disclosure of biometric data.

73.     Given this legal and regulatory landscape, according to Defendant Bezos, while serving in the capacity of the Company's CEO, "Privacy is the one aspect of Alexa that Amazon can't afford to screw up."

### 3.     Amazon's Collection and Use of Personal Data

74.     The Company collects and uses personal data from individuals in all of the Company's largest segments, including from consumers of the Company's e-commerce business (e.g., the Alexa virtual assistant), from employees of the e-commerce business or Whole Foods (another subsidiary of Amazon), from customers of AWS, and through the Ring doorbell system.

75.     Placing the Company and its officers and directors on notice, Amazon has already faced a number of class actions brought by its employees for violations of BIPA, including:

- *Perry v. Amazon Logistics, Inc., et al.*, No. 1:23-cv-03383 (N.D. Ill.);

- *Redd v. Amazon.com, Inc., et al.*, No. 1:20-cv-06485 (N.D. Ill.);

- *Jones v. Whole Foods Market Group, Inc.*, No. 1:22-cv-01389 (N.D. Il.); and

- *Thompson v. Amazon.com, Inc.*, 1:23-cv-03717 (N.D. Il.) (alleging violations of the Illinois Genetic Privacy Act ("GIPA"))

76.     Then, in 2016, Amazon launched Rekognition, the Company's core facial

recognition product. Rekognition allows users to match new images of faces with existing, known facial images "based on their visual geometry, including the relationship between the eyes, nose, brow, mouth, and other facial features." Rekognition is a cornerstone of many of Amazon's largest consumer products and services, including its photo platform, Amazon Photos, its smart home systems and cameras, and its virtual assistant technology, Alexa.

77. Amazon is also the largest provider of facial recognition technology to law enforcement agencies. The Company has marketed its Rekognition software to agencies, such as the U.S. Immigration and Customs Enforcement and the Federal Bureau of Investigation, to monitor individuals they consider "people of interest." Amazon has also partnered with more than 1,300 local law enforcement agencies, allowing those agencies to use footage from Amazon's Ring home security cameras in investigations.

78. While wielding a powerful tool, Amazon has expanded these efforts marketing their facial recognition software to government agencies despite dire warnings from consumers, employees, members of Congress, and stockholders.

79. Specifically, in July 2018, the American Civil Liberties Union of Northern California ("ACLU") published the results of a study it conducted regarding Rekognition's accuracy. According to the study, Rekognition incorrectly matched twenty-eight members of the U.S. Congress to people who had been arrested for a crime. The false matches disproportionately involved people of color. That summer, nearly seventy civil rights and research organizations wrote a letter to Bezos demanding that Amazon stop providing facial recognition technology to governments. In their letter, they called the Company to "stand up for civil rights and civil liberties," stating "Rekognition is a powerful surveillance system readily available to violate rights and target communities of color." Amazon's own employees demanded the Company to stop selling its Rekognition facial recognition software to law enforcement, citing concerns over the "unique threat to civil rights and especially to the immigrants and people of color under attack by [President Donald J. Trump's] administration."

### *Alexa and E-Commerce Privacy Violations*

80. In 2014, Amazon began its foray into being an active presence in its customers'

- 17 -

homes with its Alexa virtual assistant. Amazon's Alexa is now found on countless devices in millions of households, including on smartphones, televisions, speakers, as well as in Amazon's Echo products. As part of its services, Amazon's Alexa recognizes and stores details related to voice patterns and makes and stores recordings of its interactions with users.

81.     Additionally, Amazon Alexa and Echo devices are designed to record and respond to communications immediately after an individual says a wake word (usually "Alexa" or "Echo"). If the wake word is recognized, Alexa records the ensuing communication and then transmits the recording to Amazon's servers for interpretation and processing before receiving the relevant data in response. Alexa also records surrounding voices and sounds once activated, including those not spoken by the user conversing with Alexa. Amazon uses voice recognition technology to surreptitiously collect, use, and store voiceprints of its users to identify them, as well as using voice pattern data in conjunction with other customer data for its recognition capabilities. Such recordings and transcripts are retained indefinitely as part of a user's account, even if the user stops using the account for years. More than 800,000 children under 13 years old have their own Alexa profiles. Alexa capability can be found on more than 100 million devices sold since January 2020.[3] These include televisions, light bulbs, smart locks, phones, thermostats, appliances, speakers, and vehicles, in addition to Amazon's own line of Echo products.

82.     Amazon prominently and repeatedly assured its users, including parents, that they could delete voice recordings collected from Alexa voice assistant and geolocation information collected by Alexa. Instead, Amazon kept portions of that information for years and used the unlawfully retained data to further develop Alexa's voice recognition powers for Amazon's own business purposes (*e.g.*, developing the Alexa product's voice recognition powers), at the expense of children's privacy.

83.     Compounding the privacy issues, Amazon violated the Children's Online Privacy Protection Rule ("COPPA Rule") and Federal Trade Commission Act by: misrepresenting that

---

[3] Ben Fox Rubin, *Amazon's Alexa World Just Got Much Bigger*, CNET, Jan. 6, 2020, https://www.cnet.com/home/smart-home/amazon-sees-alexa-devices-more-than-double-in-just-one-year/. Last accessed July 12, 2023.

HERMAN JONES LLP
15113 Washington Ave. NE
Bainbridge Island, WA 98110

Amazon would delete voice transcripts and geolocation information of users from Amazon's voice assistant service upon request and limit employees' access to Alexa users' voice information; failing to delete children's personal information at the request of parents; and by retaining children's personal information longer than reasonably necessary to fulfill the purpose for which the information was collected.

84. As alleged in a complaint filed by the Department of Justice on behalf of the Federal Trade Commission ("FTC"), "between August 2018 and September 2019, Amazon Alexa users' voice recordings were accessible to 30,000 of its employees—approximately 15,000 of whom lacked any business need for such access. Indeed, many of these employees did not even work on Alexa-enabled products. This overbroad grant of access violated Amazon's own "least permission" policies, which prohibited granting access to sensitive data beyond what is needed for a particular job function."[4] Amazon has also been named as a defendant in class actions alleging for privacy violations by Alexa. *See Wilcosky v. Amazon.com, Inc. et al.*, No. 1:19-cv-05061 (N.D. Ill.) (consolidated with other cases); *Garner v. Amazon.com, Inc.*, No. 2:21-cv-00750-RSL (W.D. Wash.); *Schaeffer v. Amazon.com, Inc. et al.*, No. 3:21-cv-01080 (S.D. Ill.).

85. On June 26, 2019, the Wilcoksy Class Action was filed in the in the Circuit Court of Cook County, Illinois on behalf of Amazon users (the "Wilcosky Class Action"). The Wilcosky Class Action, which includes a subclass for individuals who do not have Alexa accounts ("bystanders") and a subclass for minors, asserted causes of action under Section 14/15(b) and (a) of Chapter 740 of the Illinois Compiled Statutes. Specifically, the plaintiffs allege that Amazon's Alexa and Echo devices capture, collect and retain voiceprints of any and all people who speak near Alexa devices, regardless of age or affiliation with Amazon. And in an effort to improve the voice and speech recognition technology, Amazon then retains every voice recording created by the user and any individual who happens to be speaking near the Alexa device. The plaintiffs in the Wilcoksy Class Action assert that Amazon never informed them, by written notice or otherwise, that Amazon collected, stored, and used their biometric identifiers and information, or

---

[4] Complaint ¶29, *United States of America v. Amazon.com, Inc. and Amazon.com Services, LLC*, Case No. 2:23-cv-00811 (W.D. Wash. May 31, 2023)

of the specific purpose and length of term for which their biometric identifiers were being collected, stored, and that Amazon does not publicly provide a retention schedule or guidelines for permanently destroying their biometric data. The plaintiffs in the Wilcoksy Class Action seek damages in the amount of $1,000 for negligent and $5,000 for intentional violation of BIPA, *per violation*. Amazon removed the action to federal district court for the Northern District of Illinois on July 26, 2019.

86. On top of BIPA class actions, Amazon has faced over 75,000 individual arbitration demands for privacy violations by devices deploying Alexa, forcing Amazon to foot the bill for tens of millions of dollars in case initiation fees due under its own arbitration policy—not to mention Amazon's own attorneys' fees, as well as damages and attorneys' fees in any arbitration awards.[5]

87. Further, Amazon faces a €746 million fine imposed by the Luxembourg National Commission for Data Protection on July 16, 2021 as a result of Amazon's violations of the European Union's GDPR, and a €35 million fine issued on December 7, 2020 for GDPR violations because the Amazon.fr site deposited cookies on visitors' computers without consent.

### *Ring*

88. Amazon settled allegations about privacy violations by its home security system, known as "Ring," in 2023 for $5.8 million and injunctive relief. *See Federal Trade Commission v. Ring, LLC*, No. 1:23-cv-01549 (D.D.C.). The Federal Trade Commission alleged Ring, prior to September 2017, gave every employee and third-party contractors unnecessary and unrestricted access to download, save, or transfer customers' sensitive video data, which data was all stored unencrypted on Ring's network. That resulted in multiple known instances of employee misconduct, and even when Ring finally limited access to customers' video recordings, Ring still did not obtain customer consent for such disclosure. Making matters worse, before January 2020, Ring systematically failed to protect against and implement controls for well-known online attacks

---

[5] *See* Michael Corkery, *Amazon Ends Use of Arbitration for Customer Disputes*, N.Y. TIMES, (July 22, 2021), https://www.nytimes.com/2021/07/22/business/amazon-arbitration-customer-disputes.html (reporting that each arbitration demand cost Amazon about $2,900 at the outset – which would equal $217 million for 75,000 arbitration demands).

called "credential stuffing" and "brute force." This caused approximately 55,000 U.S. customers to suffer account compromises, including appalling incidents where bad actors used a Ring camera's two-way communication functionality to harass, threaten, insult, and traumatize individuals in their homes. For example, several children were the objects of hackers' racist slurs, a teenager was sexually propositioned, an elderly woman was sexually propositioned, and an individual received a death threat.

89. In addition to the Federal Trade Commission's action, multiple class actions addressing Ring's privacy violations failings have been filed. *See In re: Ring LLC Privacy Litigation*, No. 2:19-cv-10899-MWF-RAO (C.D. Cal.); *Wise v. Ring, LLC*, No. 2:20-cv-01298-JCC (W.D. Wash.).

90. In 2019, an investigation by Massachusetts Senator Edward Markey concluded that "Ring has no oversight/compliance mechanisms in place to ensure that users don't collect footage of children," "Ring has no compliance mechanisms in place to prohibit law enforcement from requesting and obtaining footage that does not comply with Ring's Terms of Service," and that "Ring refuses to commit to not selling users' biometric data." *See* https://www.markey.senate.gov/news/press-releases/senator-markey-renews-investigation-into-amazon-rings-surveillance-practices-and-cooperation-with-police.

91. Seemingly an acknowledgment by Amazon that the Company collects biometric information of nonconsenting individuals, Amazon and/or Ring has applied for or been awarded at least around 17 patents for doorbell video cameras obtaining biometric information from "suspicious" people.

### *Amazon Web Services ("AWS")*

92. As part of Amazon's suite of services offered through AWS to commercial customers, AWS stores various types of personal identifying information ("PII"), including biometric information, that is collected by those customers. Such information can include, for example, fingerprints or hand scans of an AWS customer's employees for security and identification purposes. Additionally, AWS stores PII of the individual customers of its commercial AWS customers, such as voiceprints used to identify callers to a call center or even

the scanned facial geometry of players of video games.

93.    In and around September 2021, Amazon announced a series of new updates, focusing on the biometric capabilities of some of its hardware products, as well as on the Company's AWS marketplace.[6]    By way of example, on Monday September 27, 2021, at Amazon's Enterprise Connect event, the Company announced three new capabilities for Amazon Connect for contact centers.    According to the Company's new data, tens of thousands of AWS customers are supporting more than 10 million contact center interactions a day on Amazon Connect.    The new platform updates employ voice biometrics via AWS's caller authentication tool Amazon Connect Voice ID.    The biometric solution reportedly provides real-time caller authentication and enables voice access via machine learning by analyzing the caller's speech attributes, like rhythm, pitch, and tone.    Another biometric update unveiled by Amazon at its product launch event related to the Echo Show 15, and its face biometrics capabilities.    The novel Visual ID biometrics feature enables Alexa devices to show users personalized recommendations, calendars, to-do lists, and more when their faces enter the camera's field of vision.

94.    On October 16, 2020, a federal consumer class action lawsuit was filed against Amazon Web Services Inc. and Pindrop Security Inc. on behalf of Illinois citizens who used Amazon Connect and Pindrop's voice authentication and/or fraud detection technology during the specified class period (the "McGoveran Class Action"). The McGoveran Class Action asserted causes of action under section 14/15(a)-(e) of Chapter 740 of the Illinois Compiled Statutes. Specifically, the plaintiffs asserted that Amazon collected, captured, obtained, possessed and disseminated the biometric voice identifiers of the plaintiffs for profit and without their consent in violation of BIPA.    The plaintiffs further asserted that Amazon failed to use reasonable standards of care in storing and protecting the plaintiffs' biometric information and biometric identifiers in violation of BIPA.    The plaintiffs are seeking damages in the amount of $1,000 for negligent and $5,000 for intentional violation of BIPA, *per violation*.

---

[6] Mascellino, *Alessandro, Amazon Unveils Series of Face and Voice Biometrics Updates, Biometric Update*, BiometricUpdate.com, 30 Sept. 2021, https://www.biometricupdate.com/202109/amazon-unveils-series-of-face-and-voice-biometrics-updates. Accessed July 12, 2023.

HERMAN JONES LLP
15113 Washington Ave. NE
Bainbridge Island, WA 98110

95.     Amazon has faced a number of other class actions over the privacy violations of services hosted by AWS, including:

- *Hogan v. Amazon.com Inc.*, No. 2:21CV00905 (W.D. Wash.);

- *Mayhall v. Amazon Web Services Inc. et al.*, No. 2:21CV01473 (W.D. Wash.);

- *Dorian v. Amazon Web Services, Inc.*, No. 2:22-cv-00269 (W.D. Wash.); and

- *Trio v. Amazon Web Services, Inc.*, No. 1:23-cv-01389 (N.D. Il.);

96.     These and numerous additional class action lawsuits have placed the Company and the Board on notice of potential catastrophic harm to the Company and its shareholders. Notably, BIPA provides that an aggrieved party can obtain damages on a "per violation"—not a "per person"—basis. Thus, the potential damages recoverable against Amazon are astronomical to the point that the Company could be put out of business if the violations are not immediately addressed, stopped and remedied.

97.     The expense and burden of these cases, as well as additional cases, on the Company is substantial. In addition to direct harms from liability suits, the Individual Defendants' conduct also jeopardizes and harms one of Amazon's most important (and fragile) assets: consumer trust. Reputational damage is particularly devastating for technology companies like Amazon.

## B.    ANTICOMPETITIVE CONDUCT

98.     Amazon has engaged in several forms of antitrust misconduct, including improperly using third-party data for Amazon's private-label product creation, implementing private-label preferential treatment, and using anticompetitive contract provisions with book publishers.

99.     Bezos's business strategy is to aggressively stop competition. As an example of Bezos's mindset of the subject of competition, Bezos once referenced a famous Warren Buffett quote on businesses taking steps to prevent competition while questioning Defendant Jassy about AWS: "You've built this lovely castle, and now all the barbarians are going to come riding on horses to attack the castle . . . You need a moat; what is the moat around the castle?"[7]

---

[7] Brad Stone, Amazon Unbound: Jeff Bezos and the Invention of a Global Empire 102 (2022).

HERMAN JONES LLP
15113 Washington Ave. NE
Bainbridge Island, WA 98110

100.    Individual Defendants built that moat; now, investigations and litigation concerning Amazon's antitrust misconduct are ongoing and harming the Company.  Compounding the issue, Amazon still faces the possibility of substantial additional liability in legal actions by government antitrust enforcers, such as the FTC, and additional private lawsuits.  So far, legal action Amazon has faced for its antitrust misconduct includes: a lawsuit by the California Attorney General, class actions, and a European Union investigation.

### 1.    Statements on Anticompetitive Business Practices

101.    Certain of the Individual Defendants made materially false and misleading statements and/or omissions in connection with Amazon's antitrust misconduct and related investigations/legal action.

102.    On February 1, 2019, Amazon filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2018 (the "2018 10-K").[8]   In the 2018 10-K, Amazon failed to disclose that it was engaged in anticompetitive conduct with respect to its private-label business.  Rather, the 2018 10-K contained only a generic, highly general risk disclaimer to the effect that Amazon was "subject to general business regulations and laws, as well as regulations and laws specifically governing the Internet[] [and] e-commerce" and that these laws covered competition, among other things.  Amazon merely advised its investors that "[e]xisting and future laws and regulations may impede our growth" and failed to disclose the specific and known risks arising from the Company's anticompetitive business practices.

103.    In the 2018 10-K, Amazon reported net sales of $232.89 billion for the year.  Amazon failed to disclose, however, that these sales figures were unsustainable to the extent that they were derived from impermissible anticompetitive conduct.

104.    Appended to the 2018 10-K as exhibits were signed certifications pursuant to Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Bezos and Olsavsky, attesting that "the [2018 10-K] fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange

---

[8] The 2018 10-K was signed by Defendants Bezos, Olsavsky, Reynolds, Gorelick, Huttenlocher, McGrath, Rubinstein, Ryder, Stonesifer, and Weeks.

HERMAN JONES LLP
15113 Washington Ave. NE
Bainbridge Island, WA 98110

Act of 1934" and that "[t]he information contained in the [2018 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

105. On April 25, 2019, Amazon hosted an earnings call with investors and analysts to discuss the Company's Q1 2019 results (the "Q1 2019 Earnings Call"). When asked to comment on Amazon's efforts to sustain its growth rate in the third-party marketplace business, Olsavsky responded, in relevant part:

> So again, let me reiterate our approach. So main goal here is that it will allow customers to have the broadest selection, the best available price and also the most convenient options on how they receive the item. If we're delivering on those three elements, we're indifferent as to whether it's sold by us or a third-party. We actively recruit sellers to sell on our platform, it's because it adds selection. It adds - if it's in the FBA program, it adds Prime eligible selection.
>
> We spend billions of dollars a year, as Jeff said, on infrastructure, tools and services, not only to allow sellers to sell, but to help themselves more successfully. So we have a vested interest in the success of our sellers. Any growth acceleration or deceleration that you see can be very much tied to the total sales of the customer - that we have the customers in any country.
>
> So you'll still see the percentage of third-party units increased and has been steadily over the last few years. So again, the sellers are as important to us as anything for servicing the customers' need for price selection and convenience.

106. On or around June 3, 2019, the House Judiciary Committee initiated a bipartisan investigation into the state of competition online. Spearhead by the Antitrust Subcommittee ("Subcommittee"), the investigation examined the business practices and market dominance of Facebook, Google, Apple, and Amazon.

107. In the course of the investigation, the Subcommittee held several oversight hearings in which various officers of the above referenced companies, including their respective CEOs, offered witness testimony on topics such as the effect of market power on the press, innovation, and privacy, and the market dominance of the firms under investigation. After each of the hearings, members of the Subcommittee submitted questions for the record to the witnesses.

108. On July 16, 2019, Defendant Sutton testified before the House Judiciary Committee alongside executives from Google, Facebook, and Apple (the "July 16, 2019 Hearing"). When asked by Representative Pramila Jayapal whether Amazon "track[s] [the data] and create[s]

HERMAN JONES LLP
15113 Washington Ave. NE
Bainbridge Island, WA 98110

products that directly compete with those most popular brands that are out there," Defendant Sutton responded, in relevant part, that "data on popularity of products like much retail data is actually public data," but "[Amazon] do[es] not use any of that specific seller data in creating our own private brand products."

109. At the same hearing, when asked by the Subcommittee Chairman David N. Cicilline whether Amazon's algorithm for collecting data is used to support the sale of Amazon branded products, Defendant Sutton responded, in relevant part, "[o]ur algorithms, such as the buy box, is [*sic*] aimed to predict what customers want to buy [. . .] [a]nd we apply the same criteria whether you're a third-party seller or Amazon to that because we want customers to make the right purchase regardless of whether it's a seller or Amazon."

110. As the Subcommittee investigation proceeded, various reputable media outlets published reports that seemingly contradicted the testimony offered by Amazon's witnesses at the hearings. For example, on July 18, 2019, the investigative news organization *Capitol Forum* published an article entitled *Amazon: Former Employee Challenges Executive's Denial About Company's Use of Independent Sellers' Data*.[9] The former Amazon employee stated that Amazon "routinely tracked the popularity of independent sellers' products sold through its website," and that "[the former employee] used to pull sellers' data to look at what the best products were [. . . .]" Accordingly, the former employee's statements, published by the *Capitol Forum*, directly contradicted Defendant Sutton's sworn testimony.

111. On July 23, 2019, in response to the publication of the *Capitol Forum* article and similar reporting by other media outlets, Chairman Cicilline sent Amazon a letter requesting that the Company supplement Defendant Sutton's responses to questions at the July 16, 2019 Hearing because "[i]n several instances, Mr. Sutton responded to questions from [the Antitrust Subcommittee] by offering other ancillary information or partial and selective responses." Moreover, Chairman Cicilline's letter stated that "[i]n one instance, [Defendant Sutton's] answer has been contested by a former Amazon employee, raising questions about the veracity of his

---

[9] *Amazon: Former Employee Challenges Executive's Denial About Company's Use of Independent Sellers' Data*, The Capitol Forum (July 18, 2019).

HERMAN JONES LLP
15113 Washington Ave. NE
Bainbridge Island, WA 98110

responses under oath."

112. On July 25, 2019, Amazon hosted an earnings call with investors and analysts to discuss the Company's Q2 2019 results (the "Q2 2019 Earnings Call"). When questioned whether there would be any change in Amazon's business to focus "more towards third-party from first-party," Defendant Olsavsky stated, in relevant part:

> On your comment, I assume you meant vendors not merchants, but on the move from 1P to 3P, but no there shouldn't be -- I can't highlight anything related shifting in channel there, but I would say that we remain in different on whether – *we're focused on price convenience and selection for our customers. And whether product is a retail offering or third-party offering is not that important to us. As long as it's in stock, as long as it's priced competitively.*
>
> So, as you know our 3P selection has -- our 3P percent of units has been increasing over time and increased again in this quarter to 54% of units. *We continue to invest very heavily in our systems both for retail vendors and also for third-party merchants invest billions of dollars a year on behalf of then making Amazon a better place for customers to buy and increasingly not only vendor sales, but also third-party merchant sales.*

113. On July 26, 2019, Defendant Zapolsky sent a letter in response to Chairman Cicilline's July 23, 2019 letter, which stated, in relevant part:

> [. . .] while we prohibit in our private label strategy the use of data related specifically to individual sellers, like other retailers we use aggregated store data (e.g., total sales) and customer shopping behavior (e.g., search volume) to identify categories and products with high customer demand over a given time period. Use of aggregated store data about customers' shopping behavior is far from novel among retailers with a private label business. Many retailers, including large retailers with extensive private brand offerings and retailers with marketplaces, know the sales volume for products in their stores.[] Customers' shopping behavior in our store is just one of many inputs to Amazon's private label strategy. We also use other factors employed across the retail industry, such as fashion and shopping trends highlighted in the press and on social media, suggestions from our manufacturers for new or complementary product lines, and gaps in our product assortment relative to our competitors.
>
> * * *
>
> [W]e use aggregated store data on total sales and search volume for categories and products (unless the product is only offered by a single seller, in which case we do not use that data).
>
> * * *

HERMAN JONES LLP
15113 Washington Ave. NE
Bainbridge Island, WA 98110

[T]he featured offer algorithm does not favor any particular type of offer, but rather seeks to determine which offer to highlight based on a prediction of which offer customers would choose if they were to compare all offers in detail. If our prediction is that the customer would likely prefer a product from a Marketplace seller over the offer from Amazon, then we feature the product from the Marketplace seller. We constantly refine our predictions to reflect customer preferences, and look to factors beyond price, including fulfillment speed, delivery speed, Prime eligibility, and seller performance.2 In the rare instances that our algorithmic weighting of these factors results in a tie in our prediction between an offer from Amazon retail and a product in Fulfillment by Amazon, we again endeavor to predict accurately customers' demonstrated preferences and **feature the Amazon retail offer because our customers show a preference for products sold directly by Amazon**.

Moreover, we make all offers easily available for all customers to shop. Customers may compare the closest competing offers and add them directly to their shopping cart via the "Other Sellers on Amazon" option [. . .], which is displayed on the product detail page directly below the featured offer. Customers may also browse all offers via the offer listing page, accessible via a hyperlink below the featured offer. There, customers may compare offers, sellers, shipping speeds, and prices. Our data also demonstrate that customers who compare the available offers overwhelmingly ultimately select the featured offer, further confirming that our criteria for selecting the featured offer accurately predict customer preference.[10]

114. On October 24, 2019, Amazon hosted an earnings call with investors and analysts to discuss the Company's Q3 2019 results (the "Q3 2019 Earnings Call"). When asked to comment on the opportunities and competitiveness for third-party sellers, Defendant Olsavsky responded, in relevant part, "[o]n third party I would say we only succeed if the third party sellers succeeds. So we're heavily invested in them as they are in us. So we are constantly investing on their behalf, adding new products and features and you know we are cognizant of their economics as well and we want a business that works for both of us and we set our fees accordingly."

115. On January 31, 2020, Amazon filed the 2019 10-K. In the 2019 10-K, Amazon failed to disclose that it was engaged in anticompetitive conduct with respect to its private-label business. Rather, the 2019 10-K contained only a generic, highly general risk disclaimer to the effect that Amazon was "subject to general business regulations and laws, as well as regulations

[10] Zapolsky, David. Letter to David N. Cicilline. July 26, 2019. Retrieved from https://judiciary.house.gov/sites/democrats.judiciary.house.gov/files/documents/07.26.19%20-%20amazon%20response.pdf.

HERMAN JONES LLP
15113 Washington Ave. NE
Bainbridge Island, WA 98110

and laws specifically governing the Internet[] [and] e-commerce" and that these laws covered competition, among other things. Accordingly, Amazon failed to disclose the specific and known risks arising from the Company's anticompetitive business practices.

116.   In the 2019 10-K, Amazon reported net sales of $280.52 billion for the year. Amazon failed to disclose, however, that these sales figures were unsustainable to the extent that they were derived from impermissible anticompetitive conduct.

117.   Appended to the 2019 10-K as exhibits were signed certifications pursuant to SOX by Defendants Bezos and Olsavsky, attesting that "the [2019 10-K] fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934" and that "[t]he information contained in the [2019 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

118.   On May 1, 2020, members of the Subcommittee sent Defendant Bezos a letter in response to an April 23, 2020 *Wall Street Journal* article which alleged that Amazon employees used sensitive business information from TPSs on its platform to develop competing products.[11] The letter stated that "[i]f these allegations are true, then Amazon exploited its role as the largest online marketplace in the U.S. to appropriate the sensitive commercial data of individual marketplace sellers and then used that data to compete directly with those sellers," and encouraged Defendant Bezos to testify before the Subcommittee.

119.   On May 15, 2020, Amazon sent a letter in response to the Subcommittee's May 1, 2020 letter to Defendant Bezos, stating, in relevant part:

> Because Amazon is privileged to have third-party sellers who now account for the great majority of sales of physical goods in Amazon's store, we determined years ago to take additional steps to give sellers comfort regarding their individual data. It was purely for that reason that we went beyond any legal requirement—and beyond the protections in place at any other store we are aware of— to begin to implement internal policies to restrict the use of non-public data specific to one particular selling partner to compete directly with sellers. We did this because we thought it was the right thing to do for our selling partners, who are also critical customers of Amazon—we wanted to go the extra mile to protect the trust of

---

[11] Nadler, Jerrold. Letter to Jeff Bezos. May 1, 2020. Retrieved from https://judiciary.house.gov/uploadedfiles/2020-05-01_letter_to_amazon_ceo_bezos.pdf?utm_campaign=2719-519.

HERMAN JONES LLP
15113 Washington Ave. NE
Bainbridge Island, WA 98110

third parties selling in our stores. This policy, known internally at Amazon as our Seller Data Protection Policy, prohibits the use of nonpublic, seller-specific data to compete against our selling partners. As with any other employee policy at Amazon, we take the policy seriously, we train extensively on it, leadership reinforces that training, we audit for compliance, we examine allegations of breaches of the policy, and we iterate and improve based on what we learn. We do all of this solely in order to promote and enhance third party sellers' trust in Amazon, trust that we know is essential to our business.

\* \* \*

In particular, on the issue of our use of data, the Committee asked in July 2019 whether Amazon uses "any of the data (including aggregate data on specific product categories) it collects on Marketplace transactions to inform its private label strategy?" We responded clearly: "Yes, while we prohibit in our private label strategy the use of data related specifically to individual sellers, like other retailers we use aggregated store data (e.g., total sales) and customer shopping behavior (e.g., search volume) to identify categories and products with high customer demand over a given time period." [] In response to the Committee's written questions for the record last fall, we elaborated that the policy prohibits "Amazon's private brand products business from using individual sellers' data to decide which products to launch" and that the business is prohibited from using such data "to make sourcing, pricing, or inventory decisions for its private brand products." [] Our testimony at the Subcommittee's July 16, 2019 hearing about our company policy reaffirmed our policy and is consistent with the written record. As even the former employee quoted in the Wall Street Journal made clear, our seller data protection policy is well known to our employees, and using individual seller data to aid the private label business would be a clear violation of that policy.

120. On July 29, 2020, Defendant Bezos testified before the Subcommittee.[12] During the hearing, when asked by Representative Jayapal whether Amazon "ever access[ed] and use[d] third-party seller data when making business decisions," Defendant Bezos responded, in relevant part, "I can't answer that question yes or no. What I can tell you is we have a policy against using seller-specific data to aid our private label business, but I can't guarantee you that that policy has never been violated."

121. On September 4, 2020, Amazon submitted responses to the Subcommittee's post-

---

[12] *Online Platforms and Market Power, Part 6: Examining the Dominance of Amazon, Apple, Facebook, and Google: Hearing Before the Subcommittee on Antitrust, Com. & Admin. L. of the H. Comm. on the Judiciary*, 116th Cong. 11–12, 101–3, 109–11, 113–18, 122–25, 130–33, 138–40, 145–46, 148, 153, 160–61, 164-66 (2020) (testimony of Jeffrey P. Bezos, CEO, Amazon.com, Inc.), https:www.govinfo.gov/content/pkg/CHRG-116hhrg41317/pdf/CHRG-116hhrg41317.pdf.

July 29, 2020 hearing requests.[13]   In response to a request from Chairman Cicilline regarding Amazon employees' access to TPS data, Amazon stated:

> Amazon first learned about the alleged violations of Amazon's voluntarily adopted Seller Data Protection Policy recently reported in *The Wall Street Journal* from *The Wall Street Journal*. The *Journal*'s reporting conflates product-pricing and top- seller data—both of which are publicly displayed in Amazon's store—with the individual seller data protected by Amazon's Seller Data Protection Policy.  Amazon encourages employees to report any indication of potential lack of compliance with all internal policies, including the Seller Data Protection Policy, and Amazon responds appropriately to any such reports.

122.   On October 4, 2020, Amazon sent a letter to the Subcommittee "to follow up to questions related to Amazon's Seller Data Protection Policy and related internal investigation raised during the Antitrust Subcommittee's recent hearing and in response to the October 3 email from Subcommittee staff."[14]  The October 4, 2020 letter stated, in relevant part:

> Amazon's investigation into the *Wall Street Journal*'s allegations that Amazon employees violated the Seller Data Protection Policy is complete, and we are satisfied that the results confirm, as with all our policies, the seriousness with which we take this policy.
>
> *       *       *
>
> There is some confusion on Amazon's use of its own store data. Amazon's data about the costs of selling in its own stores—data like the cost to shelve, handle, and promote a product that all stores have and use to manage their business—does not become secret when it relates to a product sold by a third party in Amazon's store.  Amazon stills needs to process and use this information, like all retailers, to operate its store and better serve customers.  In determining whether to launch a new product, including its own private-label products, Amazon takes into account factors such as the costs to shelve, handle, and promote that product. And, like any other retailer, it combines such store data with its own procurement and other costs to determine whether it believes sales of that product will be profitable.  But that store data is the same irrespective of the seller. And, we do not receive information on costs incurred to procure or manufacture a product, or related profit data, from third-party sellers.

---

[13] Questions for the Record for Amazon following the July 29, 2020, Hearing of the Subcommittee on Antitrust, Commercial, and Administrative Law, Committee on the Judiciary. September 4, 2020.  https://docs.house.gov/meetings/JU/JU05/20200729/110883/HHRG-116-JU05-20200729-QFR052.pdf

[14] Huseman, Brian. Letter to Chairmen Nadler and Cicilline. October 4, 2020. Retrieved from https://judiciary.house.gov/uploadedfiles/letter_from_brian_huseman_to_committee__oct_04_2020.pdf.

> As an additional measure to protect the trust of our selling partners, Amazon's policy does not permit private brands employees to look at the number of sales made by a single seller. The policy does generally permit employees to look at aggregate sales data for products sold in the Amazon store—that is, data on the number of sales of a product in the Amazon store where there is more than one seller of that product. It is confusion on this point that seems to have animated this year's *Wall Street Journal* article,[] which appears to use the generic word "data" to mean both single-seller or aggregate data, resulting in the inaccurate implication that the use of any sort of Amazon sales data (even aggregate data) would violate the policy. Indeed, Amazon's records of past data queries related to the two products cited in the Wall Street Journal report show that a single former employee pulled and analyzed only aggregate data for both products in compliance with the Seller Data Protection Policy. And of course there is nothing novel about a retailer looking at its own store's aggregate sales data for a product in this way; retailers have used aggregate sales data for products sold in their stores for decades.

123. On February 3, 2021, Amazon filed the 2020 10-K. In the 2020 10-K, Amazon failed to disclose that it was engaged in anticompetitive conduct with respect to its private-label business. Rather, the 2020 10-K contained only a generic, highly general risk disclaimer to the effect that Amazon was "subject to general business regulations and laws, as well as regulations and laws specifically governing the Internet[] [and] e-commerce" and that these laws covered competition, among other things. Accordingly, Amazon failed to disclose the specific and known risks arising from the Company's anticompetitive business practices.

124. In the 2020 10-K, Amazon reported net sales of $386.06 billion for the year. Amazon failed to disclose, however, that these sales figures were unsustainable to the extent that they were derived from impermissible anticompetitive conduct.

125. Appended to the 2020 10-K as exhibits were signed Certifications pursuant to SOX by Defendants Bezos and Olsavsky, attesting that "the [2020 10-K] fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934" and that "[t]he information contained in the [2020 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

126. On October 18, 2021, members of the Subcommittee sent Amazon a letter in response to "recent, credible reporting that directly contradicts the sworn testimony and representations of Amazon's top executives—including former CEO Jeffrey Bezos—to the

Committee about their company's business practices during our investigation last Congress."[15] The letter stated that the Subcommittee was "providing [the Company] with a final opportunity to provide exculpatory evidence to corroborate the prior testimony and statements on behalf of Amazon to the Committee," and encouraged Amazon to "provide the Committee with sworn, truthful, and accurate responses to this request as we consider whether a referral of this matter to the Department of Justice for criminal investigation is appropriate."

127.    On November 1, 2021, Amazon sent a letter[16] in response to the Subcommittee's October 18, 2021 letter, stating that Amazon "ha[d] cooperated fully with the Committee's inquiries and engaged in good faith throughout this process, and the resulting record fully supports the transparency, candor, accuracy, and truthfulness of all of our statements, including on the topics raised in your letter," and that the Company "ha[d] in no way lied to or misled the Committee, and any allegation to the contrary is false and unsupported."   Further, Amazon's response letter stated, in relevant part:

> [Amazon's] statements to the Committee regarding this policy have been truthful and consistent throughout.  At the July 16, 2019, hearing our witness stated that Amazon does not use individual seller data to compete with third party sellers, clarifying specifically that Amazon does not "use any of that specific seller data in creating our own private brand products" and that Amazon does "not use their individual data when we're making decisions to launch private brands."[] We confirmed that policy and further elaborated upon our witness's live testimony in our July 26, 2019, follow-up letter to the Committee, explaining that, "While we prohibit in our private label strategy the use of data related specifically to individual sellers, like other retailers we use aggregated store data (e.g., total sales) and customer shopping behavior (e.g., search volume) to identify categories and products with high customer demand over a given time period."[] And in our October 11, 2019, response to the Committee's subsequent written questions for the record, we again confirmed that "Amazon prohibits Amazon's private brand products business from using non-public individual sellers' data to decide which products to launch, and Amazon prohibits the use of non-public individual sellers' data to make sourcing, pricing, or inventory decisions for its private brand products."[] In response to

---

[15] Nadler, Jerrold. Letter to Andy Jassy. October 18, 2021.
https://judiciary.house.gov/uploadedfiles/letter_-_amazon_misrepresentations_-_10.18.21.pdf.
[16] Huseman, Brian. Letter to Chair Nadler, Chair Cicilline, Ranking Member Buck, Vice Chair Jayapal, and Representative Gaetz. November 1, 2021.
https://judiciary.house.gov/uploadedfiles/letter_from_brian_huseman_to_committee__nov_01_2021.pdf.

Vice Chair Jayapal's question during the July 29, 2020, hearing referencing our witness's testimony of a year prior, Mr. Bezos testified, "What I can tell you is we have a policy against using seller-specific data to aid our private label business, but I can't guarantee you that that policy has never been violated."[] He also again clarified that using "aggregate data is allowed under our policies,"[] that "aggregate data" refers to more than one seller, and that Amazon's policy permits the use of aggregate data when there are many or only two or three sellers of a product.[] In written responses to questions for the record after that hearing, Amazon again explained the differences between aggregate versus seller-specific data in the Seller Data Protection Policy, elaborated on our entirely consistent prior testimony, and answered questions about Amazon's enforcement and auditing of its Seller Data Protection Policy.

128. On February 3, 2022, Amazon hosted an earnings call with investors and analysts to discuss the Company's Q4 2021 results (the "Q4 2021 Earnings Call"). When asked to discuss why TPS services experienced less growth, Defendant Olsavsky responded, in relevant part:

On 3P, I think what you're seeing is a decreasing growth rate, much like the rest of the business, as I mentioned earlier, we're dealing with the very high growth period from Q3 of 2020 through Q1 of 2021. But on a two-year basis, you're still seeing 31% compounded annual growth in the 3P seller services revenue. Granted that was in the -- it was 34% last quarter, but it's maintaining. I think the bigger point is that sellers are definitely big winners in Q4. The percentage of units up to 56% was a record for 3P. *We continue to invest a lot to make sellers -- help sellers be successful on our site. They're a big consumer of advertising as well because they use it to build their brands and add -- enable customers to see their selection and make purchases. So we're very happy with the third-party seller services businesses, and again, looking for ways to help sellers be successful*.

129. On February 4, 2022, Amazon filed the 2021 10-K. In the 2021 10-K, Amazon failed to disclose that it was engaged in anticompetitive conduct with respect to its private-label business. Rather, the report contained only a generic, highly general risk disclaimer to the effect that Amazon was "subject to general business regulations and laws, as well as regulations and laws specifically governing the Internet[] [and] e-commerce" and that these laws covered competition, among other things. Accordingly, Amazon failed to disclose the specific and known risks arising from the Company's anticompetitive business practices.

130. In the 2021 10-K, Amazon reported net sales of $469.82 billion for the year. Amazon failed to disclose, however, that these sales figures were unsustainable to the extent that

they were derived from impermissible anticompetitive conduct.

131.    Appended to the 2021 10-K as exhibits were signed Certifications pursuant to SOX by Defendants Jassy and Olsavsky, attesting that "the [2021 10-K] fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934" and that "[t]he information contained in the [2021 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

132.    The statements referenced in this section were materially false and misleading because the Individual Defendants made false and/or misleading statements and/or failed to disclose that: (i) Amazon engaged in anticompetitive conduct in its private-label business practices, including giving Amazon products preference over those of its competitors and using third-party sellers' non-public data to compete with them; (ii) the foregoing exposed Amazon to a heightened risk of regulatory scrutiny and/or enforcement actions; (iii) Amazon's revenues derived from its private-label business were in part the product of impermissible conduct and thus unsustainable; and (iv) as a result, the Individual Defendants' public statements throughout the relevant period were materially false and/or misleading.

### 2.    Lies to Congress Regarding Amazon's Anticompetitive Practices are Exposed

133.    On March 9, 2022, media outlets reported that members of the House Judiciary Committee had requested that the DOJ open a criminal investigation into Amazon and certain of its executives for allegedly lying to Congress about its business practices.

134.    As *Bloomberg* reported:

> "Amazon repeatedly endeavored to thwart the Committee's efforts to uncover the truth about Amazon's business practices," a bipartisan group of lawmakers from the House Judiciary Committee wrote Wednesday in a letter to Attorney General Merrick Garland. "For this, it must be held accountable."

> At issue is testimony given by Amazon during a 16-month congressional investigation into anticompetitive practices by tech giants. Amazon representatives, including then Chief Executive Officer Jeff Bezos, told Congress the company forbids employees from using data from third-party sellers to compete against them or craft rival products. But a series of media accounts suggested that Amazon employees have done just that, or at least found workarounds that render the policy useless.

This isn't the first time committee members have raised concerns about Amazon's testimony. Last October, the lawmakers asked Chief Executive Officer Andy Jassy to "correct the record" as they considered referring the matter to the Justice Department for criminal investigation.

Since then, the company has continued to deny it missuses seller data and refused to turn over business records, the lawmakers wrote. "As a result, we have no choice but to refer this matter to the Department of Justice," they wrote.

135.    In response, an Amazon spokesperson asserted that there was "no factual basis" for the House Judiciary Committee's allegations.

136.    Then, on April 6, 2022, *The Wall Street Journal* published an article entitled "SEC Is Investigating How Amazon Disclosed Business Practices." The article reported, in relevant part:

Federal securities regulators are investigating how Amazon.com Inc. has disclosed some details of its business practices, including how it uses third-party-seller data for its private-label business, according to people familiar with the matter.

The Securities and Exchange Commission is probing how the technology giant—the largest U.S. e-commerce retailer and cloud-computing company—handled disclosures of its employees' use of data from sellers on its e-commerce platform, the people said. The SEC's enforcement division has asked for emails and communications from several senior Amazon executives, according to one of the people.

\*       \*       \*

As a result of its 16-month investigation into technology companies including Amazon beginning in 2019, the [House Judiciary Committee] proposed a series of bills aimed at reining in tech giants. One of the measures targets Amazon's private-label business, seeking to make it unlawful for the company to give its own products preference over those of competitors, or to use sellers' nonpublic data to compete with them.

\*       \*       \*

The SEC's probe has been under way for more than a year, one of the people familiar with the matter said

137.    On this news, Amazon's stock price fell $105.98 per share, or 3.2%, to close at $3,175.12 per share on April 6, 2022.

138.    As a result of the Individual Defendants' wrongful acts and omissions, and the

1 precipitous decline in the market value of Amazon's stock, the Company has suffered significant

2 losses and damages.

3 **3. Private and Regulatory Antitrust Actions Against Amazon**

4 139. Anticompetitive misconduct has damaged the Company by exposing it to

5 substantial liability for misstatements about the misconduct in the Securities Class Action and

6 exposing the Company to liability in antitrust lawsuits or regulatory enforcement actions. Antitrust

7 actions against Amazon include consumer class actions and actions brought by regulators such as

8 the California Attorney General.

9 140. Amazon entered into agreements with third-party sellers that sell on Amazon

10 Marketplace ("TPSs"). Those agreements restrain competition and enable Amazon to create or

11 maintain its online retail monopoly. Specifically, those agreements included a Price Parity

12 Provision (in effect in the United States until March 2019), and a Marketplace Fair Pricing Policy

13 (enforced by Amazon from 2017 through the present) that are designed to and have the intended

14 effect of preventing the third-party sellers from selling their goods on other online sites at prices

15 that are lower than the price of their goods on Amazon Marketplace. Amazon's policies inflated

16 prices of goods offered for sale at online retailers other than Amazon, damaging consumers.

17 Amazon had similar policies in Europe but withdrew them under pressure from British and

18 German regulators.

19 141. Consumers have brought a number of class actions to redress Amazon's

20 anticompetitive practices in its online marketplace. *See, e.g.*, *Brown et al v. Amazon.com Inc*, No.

21 2:22-cv-00965 (W.D. Wash.); *De Coster v. Amazon.com, Inc.*, No. 2:21-cv-00693-RSM (W.D.

22 Wash.); *Frame-Wilson v. Amazon.com, Inc.*, No. 2:20-cv-00424-RAJ (W.D. Wash.); *Floyd v.

23 Amazon.com, Inc.*, No. 2:22-cv-01599 (W.D. Wash.) (anticompetitive agreement between

24 Amazon and Apple to limit third-party sellers of Apple products). In three class actions, the court

25 has sustained antitrust claims against Amazon's operation of its online two-sided marketplace

26 platform. *See Floyd v. Amazon.com, Inc.*, 2023 WL 3891973, at *6 (W.D. Wash. June 8, 2023);

27 *De Coster v. Amazon.com, Inc.*, 2023 WL 372377, at *5 (W.D. Wash. 2023); *Frame-Wilson v.

28 Amazon.com, Inc.*, 591 F. Supp. 3d 975, 986 (W.D. Wash. 2022). The California Attorney General

has also brought an action in the Superior Court of San Francisco seeking damages, a Court-approved monitor, and an end to Amazon's anticompetitive practices in its online marketplace. *People of the State of California v. Amazon.com, Inc.*, No. CGC-22-601826.

142. Although redacted in part, the California Attorney General's complaint shows high-level knowledge and direction of Amazon's anticompetitive schemes: Amazon "Director(s)," knew of Amazon's Price Parity Provision and knew its practices were unlawful when they were ongoing. Amazon's Answer in the case admits these statements were made by current or former Amazon "executives." The Superior Court of the County of San Francisco denied Amazon's demurrer attempting to dismiss the case.

143. In addition, Amazon dominates the retail market for the distribution of trade eBooks, with nearly 90% of those transactions occurring on Amazon's platform. In the U.S. market, Amazon accounts for over half of all print book sales. Amazon has been named as a defendant in additional antitrust class actions over anticompetitive conduct related to books sales. *See In re Amazon.com Ebook Antitrust Litigation*, No. 1:21-cv-00351-GHW-DCF (S.D.N.Y.) (Amazon maintains its dominance in the eBook market through its agreements with the Big Five Publishers that block other eBook platforms from competing with Amazon's e-commerce platform, Amazon marketplace); *Bookends & Beginnings LLC v. Amazon.com, Inc. et al*, No. 1:21-CV-02584 (S.D.N.Y.) (Amazon engaged in illegal price discrimination and inducing price discrimination, unlawful agreements and conspiracies with publishers of print trade books, monopolization of the market for print trade books, and conspiracy to monopolize).

144. After formal investigations opened by the European Commission in July 2019 and November 2020, Amazon agreed in December 2022 to end its anticompetitive practices. The Company committed to stop using non-public data from TPSs, treat TPSs equally regardless of whether they use Amazon's fulfillment services (i.e. the TPS chosen for the coveted "Buy Box"), and to allow Prime sellers to choose any carrier for their deliveries.[17]

---

[17] Antitrust: Commission accepts commitments by Amazon barring it from using marketplace seller data, and ensuring equal access to Buy Box and Prime, https://ec.europa.eu/commission/presscorner/detail/en/ip_22_7777 (Dec. 20, 2022).

HERMAN JONES LLP
15113 Washington Ave. NE
Bainbridge Island, WA 98110

145.    The December 2022 commitments to the European Commission relating to the "Buy Box" and Prime do not apply in Italy due to a decision on November 30, 2021 by the Italian competition authority, which decision imposed a €1.129 billion fine and remedial actions on Amazon for abusing its market position and pushing third-party sellers use its fulfillment services.[18]

## C.    MISREPRESENTATIONS TO INVESTORS ABOUT GROWING AMAZON'S E-COMMERCE BUSINESS

146.    Amazon's e-commerce business is focused on "delivering as many items as fast as possible." Amazon has pursued rapid delivery and capturing more market share even when doing so caused losses. The Individual Defendants assured investors through statements and filings made on behalf of the Company that short term costs of growing fulfillment capacity were justified by market demand for fast delivery, would crowd out competition, capture market share for Amazon, and deliver future profits. However, by at least July 2021, Individual Defendants and others at Amazon knew the opposite – the fulfillment capacity for Amazon's e-commerce business had grown too fast – yet they continued to make statements saying otherwise.

### 1.    Amazon Invests in Expanding Fast Delivery

147.    On April 29, 2021, Amazon reported it had "over more than 200 million paid Prime members worldwide." In his April 15, 2021 letter to shareholders, Bezos listed as one of Amazon's accomplishments that it boasts "more 200 million Prime members worldwide." Amazon.com, Inc. Current Report (Form 8-K) (April 15, 2021) at 1. On February 3, 2022, Amazon stated that it "continues to invest heavily in Prime" and announced the price of an annual Prime membership in the United States would increase from $119, the price set in 2018, to $139. Amazon.com, Inc. Current Report (Form 8-K) (February 3, 2022) at Ex. 99.1. In 2022, Amazon earned over $35 billion from non-AWS subscription services such as Amazon Prime. Amazon.com, Inc., Annual Report (Form 10-K) (Feb. 2, 2023) at 67. In 2020 and 2021, that revenue was $25.2 billion and $31.7 billion, respectively. *Id.*

---

[18] *See* https://www.agcm.it/media/comunicati-stampa/2021/12/A528-chiusura (press release); https://www.agcm.it/dotcmsdoc/allegati-news/A528_chiusura%20istruttoria.pdf (250-page report); *see also* Amazon.com, Inc., Annual Report at 59 (Form 10-K) (Feb. 3, 2021).

**HERMAN JONES LLP**
15113 Washington Ave. NE
Bainbridge Island, WA 98110

148.     In 2005, Amazon launched its Amazon Prime membership service, through which the Company offered free two-day shipping to its retail customers at a time when such quick delivery times were "virtually unheard of."   Amazon's promise of free two-day delivery fueled substantial growth.  For example, on May 28, 2015, Amazon forever changed online delivery by announcing free same-day delivery in 14 major cities across the United States.  In April of 2019, Amazon announced plans to transition free Prime delivery times from two-day shipping to one-day shipping over the next year, and two months later, Amazon announced it had pushed forward that plan with "free one-day shipping on over 10 million products" for Prime members—with no minimum purchase.

149.     To keep up with its increasing commitment to rapid delivery, Amazon had to expand its delivery fulfillment infrastructure, including warehouse fulfillment centers, which Amazon told investors were necessary burdens for achieving the fast delivery consumers demand.  As Amazon explained in a June 2, 2017 press release upon the opening of new fulfillment centers, one of the "[m]ost important[]" factors has been whether the locations of new sites would "improve Prime benefits with faster shipping speeds for customers."

150.     On October 24, 2019, during Amazon's Q3 2019 earnings call, Defendant Olsavsky attributed the higher costs to Amazon's continued efforts to expand one-day delivery, stating, "It's going to be the route density and other things will improve over time and get our cost structure down, but for now, there is certainly some start-up pain in adding new capacity."  As quoted in Amazon's Q3 2019 Earnings Statement, Defendant Bezos maintained that "Customers love the transition of Prime from two days to one day," adding that "It's a big investment, and it's the right long-term decision for customers."

151.     In early 2020, on the Company's January 30, 2020 earnings call for the fourth quarter of 2019, Amazon projected another "approximately $1 billion of additional cost" for one-day delivery in the first quarter of 2020.  In response to multiple questions about the continued costs of transitioning to one-day shipping, Olsavsky continued to assure investors that those costs were justified by market demand for fast delivery.  After referencing Olsavsky's prior statements about Amazon "becoming more efficient with . . . next-day" delivery, an analyst asked for details

on both the "$1 billion of [quarterly] cost" and the impact of one-day shipping on customer demand. Olsavsky responded: Amazon "will have to scale our fulfillment center network further. We grew the square footage for fulfillment and transportation by 15% each of the last two years, and we look ahead and see a step-up in that this year as we . . . start to build more capacity for the one day." Olsavsky added that Amazon would "get efficiencies" as they "learn and grow and handle more one day volume."

152.    At the same time that the Company was reassuring its investors, the transition to one-day shipping raised questions inside Amazon about how it would manage such a network. As Salal Humair—a senior principal scientist with the supply chain optimization technologies team in Amazon's inventory planning and control group—explained to *Supply Chain Dive*, for logistics, the difference between one and two-day shipping is a lot more than just 24 hours. Humair explained that location is less relevant to two-day shipping because "You can just fly to a customer in two days" almost anywhere in the continental United States. However, the location of inventory is critical when an order is expected in a single day or less, according to Humair. "This    is    a reality that made two-day shipping a much easier feat than one-day shipping.   .   .   And   how Amazon deals with inventory questions changed significantly when it decided to offer one-day shipping to its Prime members."

153.    When the pandemic struck in early 2020, bringing with it lockdowns and other restrictions that limited shoppers' ability and willingness to shop in physical stores, consumer demand for goods purchased through Amazon's e-commerce business, with its promise of fast delivery times, skyrocketed.

154.    Amazon's ambition to expand aggressively skyrocketed as well. A journalist who interviewed some of the Demand Board described it as follows: "While Mr. Clark's team didn't have a blank check, Mr. Bezos and Amazon's board of directors approved plans to aggressively build out new warehouses and transportation hubs, and go on a hiring spree to get customers their packages."[19]

---

[19] https://www.wsj.com/articles/andy-jassy-amazon-bezos-overexpansion-11655383388

HERMAN JONES LLP
15113 Washington Ave. NE
Bainbridge Island, WA 98110

155. To put the aggressive expansion into perspective, "[i]n 27 months, Amazon added about as many employees as the entire workforces of United Parcel Service Inc. and Costco Wholesale Corp. combined."[20]  As companies competed for warehouse space, Amazon was understood to be a driving force behind surging industrial space rates, which financial news outlet GlobeSt.com reported included Amazon often paying 50% to 60% above market to get the space it wanted.[21]

156. As Amazon's capital expenditures outpaced both Amazon's sales and other retailers' capital expenditures, Amazon proclaimed the benefits of its ballooning capital expenditures, assuring investors they were justified.  On October 29, 2020, during Amazon's Q3 2020 Earnings Call, Defendant Olsavsky told analysts that Amazon's fulfillment and logistics square footage would increase by 50% that year and that the Company had already spent heavily on expanding its transport capability, as part of some $30 billion in capital expenditures and leases through the third quarter.  Further, Olsavsky told analysts that the heightened transportation investment would likely continue for years to come.

157. In 2021, Amazon continued to represent publicly that it was still expanding the Company's fulfillment infrastructure, including acquiring new airplanes and fulfillment centers. Specifically, in January 2021, when customers were "relying on fast, free shipping more than ever," Amazon reported that it had purchased 11 aircrafts for their delivery network to "keep pace with meeting [their] customer promises" and a new one million square-foot "non-sort" fulfillment center in Washington (announced Feb. 18, 2021).  Consistent with its aggressive expansion efforts, Amazon reported in its 2020 Annual Report, filed on February 3, 2021 on its Form 10-K:

> The increase in fulfillment costs in absolute dollars in 2020, compared to the prior year, is primarily due to variable costs corresponding with increased product and service sales volume and inventory levels, costs from expanding our fulfillment

---

[20] https://www.wsj.com/articles/andy-jassy-amazon-bezos-overexpansion-11655383388
[21]   GlobeSt.com, Amazon Reportedly Ready to Dump Excess Warehouse Space: A voracious industrial appetite may have led to a touch of indigestion (May 23, 2022) ("Amazon has been a driving force for good rates in the hot industrial arena, often paying 50% to 60% above market to get the space they wanted. Investors were paying a 35% premium last fall when the retail giant was a tenant. Those heady days may have come to a sudden halt as a slowing of e-commerce back to pre-pandemic trends has left Amazon with a surfeit of warehouse space according to a Bloomberg report.")

network, and the COVID-19 related impact of lower productivity, increased employee hiring and benefits, and costs to maintain safe workplaces. We expect fulfillment costs as a percentage of net sales to continue to be negatively impacted through at least Q1 2021 by COVID-19 related costs.

We seek to expand our fulfillment network to accommodate a greater selection and in-stock inventory levels and to meet anticipated shipment volumes from sales of our own products as well as sales by third parties for which we provide the fulfillment services. We regularly evaluate our facility requirements.

158. However, contrary to Individual Defendants' public representations, by July 2021 at the latest, Individual Defendants had determined that Amazon's expansion plan outpaced any economic benefits to the Company.

159. Instead of disclosing this determination, Amazon, helmed by Individual Defendants, misleadingly announced the opening of multiple sites that in actually would never open, be delayed indefinitely or which sat idle. In fact, by September 2022, the Company had closed or cancelled at least 44 facilities and delayed opening an additional 25 facilities.

160. Based on interviews with some of the Individual Defendants (including the Demand Board) and those who worked with them, the declining demand and resulting cutbacks were later reported by the *Wall Street Journal*:

> **By July 2021, it became clear to Mr. Jassy and Amazon's logistics team that Amazon's capacity was outpacing demand.** They made a series of intensifying cutbacks to the plans for capacity growth, said people involved in the decisions. They again cut back capacity growth plans in September and December of 2021.[22]

161. Jassy, who had recently replaced Bezos as CEO, began "working to cut back the excesses" from the Company's "Bezos-Led Overexpansion," which caused one of the "worst stretches for financial performance in Amazon's history."

## 2. False and Misleading Statements About Amazon's Expansion

162. Rather than acknowledge these cutbacks, Amazon reassured investors that the Company's aggressive expansion plans were justified and would continue.

163. During Amazon's quarterly earnings call on July 29, 2021, Olsavsky did not waver

---

[22] June 16, 2022 WSJ Article

HERMAN JONES LLP
15113 Washington Ave. NE
Bainbridge Island, WA 98110

in defending Amazon's aggressive expansion strategy and misleadingly telling investors the expansion continued apace:

> I'll finish up with some comments on our ongoing investments in operations. As we think about the pull-forward in demand we've seen these past 18-months, it has required and will continue to require a significant amount of investment in our fulfillment network . . . [s]o there's more work to do including additional build outs for our [fulfillment centers] as well as our middle-mile and last-mile capabilities to support our fast improving delivery offers for customers.

164. Amazon's Head of Investor Relations, David Fildes, followed-up on Olsavsky's statements during the above call, adding "I'd just say **our focus is really squarely on adding capacity** to meet the current high customer demand that Brian talked about . . ." Later in the call, Olsavsky reiterated, that "**we're adding a lot of capacity**" and Fildes reiterated, "So as we've been saying here, that work is not done yet. **We're continuing to expand. You'll see that investment throughout 2021.**"

165. On February 3, 2022, Amazon hosted an earnings call with investors and analysts to discuss the Company's Q4 2021 results. During that call, Olsavsky affirmed Amazon's aggressive expansion efforts remained supported by consumer demand for fast delivery:

> [Brian T. Olsavsky:] **[W]e continue to see an increase in customer demand and sales during the remainder of 2021, even as the economy opened back up . . . [w]e've invested significantly to keep pace with this demand, including nearly doubling our operations capacity in the past two years, expanding our fulfillment center footprint while adding significant transportation assets to ensure fast, on-time delivery.** There are now 1.6 million Amazon employees worldwide, also doubling in the two-year period.
>
>             \*      \*      \*
>
> On the fulfillment center side, that's about 30% of the spend in the last two years. We see that moderating and that will probably now match growth of our underlying businesses. I think there's always things that can kick up that growth rate, things like expansion of our FBA business, expansion of cube that maybe not be different than the square footage. **So there's – we want to have capacity to have a healthy retail and FBA business, because that fuels Prime and one-day delivery and two-day delivery and same-day delivery. So that's very important. But we see the FCPs likely moderating this year. And then the third piece is transportation.** We still see additional levels of investment in that in 2022. So if you wrap that up, we expect CapEx, including equipment finance leases to increase year-over-year. I can't give you the exact percentage, but hopefully, it gives you a little more dynamic on what – how we approach it.

### 3. The Truth is Revealed Concerning Amazon's E-Commerce Business

166. Amazon's misrepresentations concerning its warehousing and expansion plan were revealed on April 28, 2022, when Amazon announced its financial results for the first quarter of 2022, including an overall net loss of $3.8 billion. In Amazon's earnings release, filed with the SEC that same day on Form 8-K, Defendant Jassy admitted that Individual Defendants were "no longer chasing physical or staffing capacity."

167. During the Company's conference call with analysts that day, Defendant Olsavsky stated that "we've quickly transitioned from being understaffed to being overstaffed, resulting in lower productivity. This lower productivity added approximately $2 billion in cost compared to last year." Defendant Olsavsky did not say the Company had spent the last nine months reassuring the market that Amazon's continued, increasing investments in fulfillment capacity was necessary and would add value, but referring to decisions made no later than "**early 2021**," he admitted:

> [W]e currently have excess capacity in our fulfillment and transportation network. [W]e made conscious decisions in 2020 and early 2021 to not let space be a constraint on our business. During the pandemic, we were facing not only unprecedented demand but also extended lead times on new capacity, and we've built towards the high end of a very volatile demand outlook. We estimate that this overcapacity, coupled with the extraordinary leverage we saw in Q1 of last year resulted in $2 billion of additional costs year over year in Q1. We do expect the impacts of this fixed cost leverage to persist for the next several quarters as we grow into this capacity.

168. In response to Amazon's April 28, 2022 disclosure, the Company's common stock declined 14.05%, from a closing price of $2,891.93 per share on April 28, 2022 to a closing price of $2,485.64 per share the next day.

169. On September 20, 2022, the investors filed a Consolidated Class Action Complaint in the Securities Class Action.

170. Moreover, Amazon's Prime membership program relies on deceptive practices to artificially boost the number of membership subscriptions. *See Federal Trade Commission v. Amazon.com, Inc.*, No. 2:23-cv-00932 (W.D. Wash.) (alleging that "for years" Amazon "duped millions of consumers into unknowingly enrolling in its Amazon Prime service); *Dorobiala v. Amazon.com, Inc.*, No. 2:22-cv-01600-RSM (W.D. Wash.) (class action). For years, consumers

HERMAN JONES LLP
15113 Washington Ave. NE
Bainbridge Island, WA 98110

could enroll in Prime with one or two clicks, but to cancel a subscription consumers had to go navigate a four-page, six-click, fifteen-option process that Amazon fittingly named the "Iliad Flow." During the course of the FTC's investigation into Amazon's unfair and deceptive practices in its use of recurring subscriptions to Amazon Prime, the FTC issued Civil Investigative Demands to Bezos, Jassy, and Clark, among at least other 14 Amazon executives.

## V. THE INDIVIDUAL DEFENDANTS' DUTIES

### A. FIDUCIARY DUTIES

171. By reason of their positions as officers and/or directors of Amazon and because of their responsibility to control the business and corporate affairs of the Company, the Individual Defendants owed, and owe, the Company and its stockholders the fiduciary obligations of good faith, loyalty, due care, and candor and were, and are, required to use their utmost ability to control and manage the Company in a just, honest, fair, and equitable manner. Each Individual Defendant owed, and owes, the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company, as well as the highest obligations of fair dealing and not to act in furtherance of his or her personal interest or benefit.

172. Because of their positions of control and authority as officers and/or directors of Amazon, Individual Defendants were able to, and did, directly and/or indirectly, exercise control over the wrongful and illegal acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with Amazon, each Defendant had knowledge of material, nonpublic information regarding the Company. In addition, as officers and/or directors of a publicly held company, Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's business, operations, and prospects including accurate information concerning financial, operational, legal regulatory and enforcement risks, so that the market price of the Company's stock would be based on truthful and accurate information.

173. At all times relevant hereto, each Defendant was the agent of each of the other Individual Defendants and of Amazon and was at all relevant times acting within the course and scope of such agency.

174. To discharge their duties, Individual Defendants were, and are, required to exercise

HERMAN JONES LLP
15113 Washington Ave. NE
Bainbridge Island, WA 98110

reasonable and prudent oversight and supervision over the management, policies, practices, and controls of Amazon. By virtue of such duties, Individual Defendants were, and are, required to, among other things:

    (a) Exercise good faith to ensure that the Company is operated in a diligent, efficient, honest, and prudent manner and in accordance with all applicable laws (including federal and state laws, government rules and regulations, and the Company's certificate of incorporation and bylaws);

    (b) Neither violate nor knowingly permit any officer, director, or employee of Amazon to violate any applicable laws, rules, or regulations;

    (c) Remain informed as to the status of Amazon's operations, and upon receipt or notice of information of illegal, imprudent or unsound practices, to make a reasonable inquiry in connection thereto and to take steps to correct such conditions or practices;

    (d) Establish and maintain systematic and accurate records and reports of the business and affairs of Amazon and procedures for the reporting of the Company's business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

    (e) Maintain and implement an adequate, functioning system of internal controls, such that the affairs and operations of Amazon are conducted in accordance with all applicable laws, rules, and regulations; and

    (f) Truthfully and accurately inform and guide investors and analysts with respect to the business operations of the Company.

## B. DUTIES PURSUANT TO AMAZON'S CODE OF BUSINESS CONDUCT AND ETHICS

175. Amazon has in place a Code of Business Conduct and Ethics. The very first principle it espouses states, "Employees must follow applicable laws, rules and regulations at all times. Employees with questions about the applicability or interpretation of any law, rule or regulation, should contact the Legal Department."

176. Amazon's Code of Business Conduct and Ethics also applies equally to its

directors, stating "With respect to their service on behalf of the Company, Amazon.com's Board of Directors must comply with the relevant provisions of this Code of Conduct, including conflicts of interest, insider trading and compliance with all applicable laws, rules and regulations."

## C. ADDITIONAL DUTIES OF THE AUDIT COMMITTEE DEFENDANTS

177. In addition to the duties discussed above with respect to all of the Individual Defendants, the Audit Committee Defendants owed specific duties to Amazon under the Audit Committee Charter ("Audit Charter"). Among other things, the Audit Charter charges the Audit Committee Defendants with the following authority and responsibilities, among others:

> 1. *Annual and Quarterly Financial Reporting*: The Committee reviews and discusses with management and the independent auditors the annual audited and quarterly unaudited financial statements and related disclosures included in the Company's quarterly earnings releases and in the Company's periodic reports on Form 10-K and 10-Q.

> \*       \*       \*

> 3. *Disclosure, Accounting and Financial Controls*: The Committee discusses with management, the senior internal audit executive and the independent auditors the adequacy and effectiveness of the Company's disclosure controls and procedures, the adequacy and effectiveness of the Company's internal control over financial reporting, and the Company's risk assessment and risk management policies, including data privacy and security, business continuity, and operational risks.

> \*       \*       \*

> 10. *Legal, Regulatory, and Compliance*: The Committee oversees legal and regulatory matters that may have a material impact on the Company's financial statements and the Company's Code of Business Conduct and Ethics (other than with respect to workplace discrimination and harassment). The Committee periodically reviews the Company's compliance policies and procedures, and receives and reviews certain reports on complaints, allegations, and incidents reported pursuant to the Code of Business Conduct and Ethics or through the Company's other hotlines and procedures.

## D. ADDITIONAL DUTIES OF THE NOMINATING AND CORPORATE GOVERNANCE COMMITTEE DEFENDANTS

178. In addition to the duties discussed above with respect to all of the Individual Defendants, the Nominating and Corporate Governance Committee Defendants owed specific duties to Amazon under the Nominating and Corporate Governance Committee Charter ("NCGC

HERMAN JONES LLP
15113 Washington Ave. NE
Bainbridge Island, WA 98110

Charter"). Among other things, the NCGC Charter charges the Nominating and Corporate Governance Committee Defendants with the following authority and responsibilities, among others:

> 11. The Committee oversees and monitors the Company's policies and initiatives relating to corporate social responsibility, including human rights and ethical business practices, and risks related to the Company's operations and engagement with customers, suppliers, and communities, other than with respect to human capital management matters, which are overseen by the Leadership Development and Compensation Committee, and compliance and controls matters, which are overseen by the Audit Committee.

> 12. The Committee oversees the Company's corporate governance initiatives and periodically considers, and reports to the Board on, corporate governance policies. In connection with this responsibility, the Committee develops and periodically reviews the Corporate Governance Guidelines and recommends changes to the Board.

179. "Under its charter, the Nominating and Corporate Governance Committee, which is comprised of directors with experience in emerging technologies and public policy, is given responsibility for overseeing and monitoring the Company's policies and initiatives relating to corporate social responsibility, including human rights and ethical business practices, and risks related to the Company's operations and engagement with customers, suppliers, and communities." 2022 Proxy Statement, at p. 86.

180. The Nominating and Corporate Governance Committee Defendants have allegedly provided oversight on behalf of the Board on aspects of Rekognition, including its facial recognition capabilities, and of Ring. "These reviews focus on the actual operation and use of Amazon Rekognition, the potential concerns and abuses that critics have suggested could arise from the technology, and our actions to resolve or mitigate those risks and concerns." *Id.* The Committee purportedly reviewed internal tests of Amazon's facial recognition software, which tests may themselves have used biometric data for profit in violation of BIPA by relying on a collection of photos (including of children) taken from Flickr. *Id.* (citing https://aws.amazon.com/blogs/aws/thoughts-on-machine-learning-accuracy/, which reports the results of a test Amazon ran "using a dataset of over 850,000 faces commonly used in academia").

## E. ADDITIONAL DUTIES OF THE LEADERSHIP DEVELOPMENT AND COMPENSATION COMMITTEE DEFENDANTS

181. In addition to the duties discussed above with respect to all of the Individual Defendants, the Leadership Development and Compensation Committee Defendants owed specific duties to Amazon under the Leadership Development and Compensation Committee Charter ("LDCC Charter"). Among other things, the LDCC Charter charges the Leadership Development and Compensation Committee Defendants with the following authority and responsibilities, among others:

(a) Overseeing and monitoring the Company's strategies and policies related to human capital management within the Company's workforce, including with respect to policies on diversity and inclusion, workplace environment and safety, and corporate culture.

(b) The Committee establishes and reviews the compensation of the Company's Chief Executive Officer ("CEO") and all other executive officers, including establishing terms of employment for new executive officers; periodically reviewing and approving compensation for existing executive officers; reviewing and approving any compensation-related performance goals, including evaluating the satisfaction of such goals; and approving the terms associated with any executive officer's termination of employment.

## VI. DAMAGES TO AMAZON

182. As a direct and proximate result of the Individual Defendants' misconduct, actions, and failure to act, Amazon has suffered and continues to suffer significant harm, including, but not limited to:

(a) Legal and other costs incurred, and the distraction of, investigating and defending Amazon—including its subsidiaries, such as AWS—in the Consumer Privacy Actions, the Antitrust Actions, and the Securities Class Action, as well as potentially hundreds of millions of dollars in damages in connection with any settlements or judgments in connection therewith or any other related litigation;

(b) Legal and other costs incurred, and the distraction of, investigating and defending Amazon in connection with the DOJ Criminal Investigation and the SEC Probe, as well as the costs incurred in connection with any penalties, fines, or other monetary impositions resulting therefrom;

(c) Loss in market capitalization;

(d) Legal and other costs incurred due to an increase in regulatory scrutiny of Amazon's future products and services;

(e) Costs incurred related to any corrective measures or changes to Amazon's products or services in order to comply with laws or regulations applicable to the misconduct;

(f) The irreparable harm to the Company's reputation, loss of credibility, and loss of goodwill associated with the Company's continued violations of law and its failure to properly disclose the associated risks in its public statements concerning its business, operations, and prospects;

(g) Costs incurred from the unjust and unwarranted compensation and benefits paid to the Individual Defendants and other members of Amazon's management while they were engaged in the improper conduct alleged herein; and

(h) Mounting risk of catastrophic statutory damages on a *per violation* basis, with millions of violations occurring daily each and every time biometric data is captured and stored on Amazon devices, third party data is stored in Amazon cloud-based services, and data is captured concerning Amazon employees.

## VII.  CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

183.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct alleged herein giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

184.    During all times relevant hereto, the Individual Defendants, collectively and

HERMAN JONES LLP
15113 Washington Ave. NE
Bainbridge Island, WA 98110

individually, initiated a course of conduct that was designed to and did, among other things: (i) deceive the investing public including stockholders of Amazon; and (ii) permit flawed and ineffectual internal controls over the Company's operations. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

185. The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. During this time, the Individual Defendants caused and/or allowed the improper conduct described herein.

186. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of state and federal law, breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and to conceal adverse information concerning the Company's business, operations, and future prospects.

187. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly engage in the improper conduct described herein. Because the Individual Defendants' actions occurred under the authority of the Board, each Individual Defendant was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

188. Each Individual Defendant aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## VIII. DERIVATIVE ALLEGATIONS

189. Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress injuries suffered, and to be suffered, by Amazon as a direct result of the breaches of fiduciary duty, waste of corporate assets, and unjust enrichment by the Individual

Defendants.

190.    Amazon is named as the nominal defendant in this case solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

191.    Plaintiffs will adequately and fairly represent the interests of the Company and its stockholders in prosecuting this action.

192.    Due to the Board's direct involvement in the wrongdoing, its members' lack of independence, and the substantial likelihood of liability its members face, prosecution of this action independent of the Board is in the best interests of the Company and its stockholders.

## IX.    FUTILITY ALLEGATIONS

193.    Amazon's current Board, the Demand Board, consists of eleven members, Bezos, Jassy, Alexander, Cooper, Gorelick, Huttenlocher, McGrath, Nooyi, Rubinstein, Stonesifer, and Weeks.  Plaintiffs have not made any demand on the Board to institute this action because such a demand would be a futile and useless act.

194.    Plaintiffs only need to allege demand futility as to a majority of the Board (i.e., six of the eleven members of the Demand Board) at the time this action was commenced.

## A.    DEMAND IS EXCUSED AS TO DEFENDANTS BEZOS AND JASSY BECAUSE THEY LACK INDEPENDENCE

195.    Both Defendants Bezos and Jassy fall under the NASDAQ's definition of directors who are not independent.  According to the NASDAQ's rules regarding listing, a director is not independent if he or she is, or has been within the last three years, an employee or an executive officer of the listed company.  Because Defendant Jassy is Amazon's current President and CEO, he may not be considered independent.  Likewise, Defendant Bezos may not be considered independent as he served as its CEO from Amazon's founding up until July 2021.  The Company's 2022 Proxy Statement does not indicate that Defendants Bezos and Jassy are "independent" as defined by the NASDAQ rules.

196.    Furthermore, Defendant Jassy is not independent because his principal professional occupation is his employment with Amazon.

197. As President and CEO of Amazon beginning in July 2021 and previously CEO of AWS since April 2016, Defendant Jassy received significant compensation from the Company as described herein. Accordingly, Defendant Jassy lacks independence from the other members of the Board due to his interest in maintaining his executive positions.

198. This lack of independence renders Defendants Bezos and Jassy incapable of impartially considering a demand to commence and vigorously prosecute this action.

## B. DEMAND IS EXCUSED BECAUSE THE DEMAND BOARD FACES A SUBSTANTIAL LIKELIHOOD OF LIABILITY FOR THEIR MISCONDUCT

199. Each member of the Demand Board breached their fiduciary duties by, among other things:

(a) Condoning illegal anticompetitive practices and violations of privacy laws, including through their refusal and failure to conduct direct oversight over compliance with the legal and regulatory requirements described herein;

(b) Failing to heed and take action upon red flags indicating violations of applicable laws and regulations across the Company and that the Company's internal controls to ensure compliance with applicable laws and regulations were inadequate;

(c) Failing to maintain an adequate system of oversight, accounting controls and procedures, disclosure controls, and other internal controls, which were necessary to prevent or promptly correct the improper statements made on the Company's behalf;

(d) Themselves affirmatively making, allowing to be made, and/or failing to correct improper statements in SEC filings relating to the Company's operations, internal controls, legal proceedings and risks (including financial, operational, legal, regulatory and enforcement, risks); and

(e) Awarding Amazon's senior executives lavish compensation packages, despite their knowledge of and responsibility for the Company's willful misconduct.

200. Amazon's violations of BIPA are longstanding, have been raised before the Demand Board, and have been repeatedly disregarded by the Demand Board. In Amazon's 2019 and 2020 Proxy Statements, the Board even dismissed shareholder concerns specifically raising

the illegality and privacy implications of Amazon's facial recognition system, Rekognition, and Ring home security system. A majority of the current members of the Demand Board – namely, Defendants Bezos, Gorelick, Huttenlocher, McGrath, Nooyi, Rubinstein, Stonesifer, and Weeks – were among the directors who dismissed shareholder concerns about BIPA and privacy violations.

201. In Amazon's 2022 Proxy Statement, the current Demand Board dismissed the risks posed to the Company by Amazon's flouting of consumer privacy rights under the law and responded to shareholder concerns by attempting to reassure shareholders that: "Our Board has reviewed Amazon Rekognition, along with other programs, as part of numerous AWS business reviews, and has also reviewed Ring in several of its meetings since our acquisition of Ring."[23]

202. Each member of the Demand Board, by virtue of their positions as trusted fiduciaries of the Company charged with overseeing the Company's business and operations, knew of the Company's anticompetitive practices as well. Amazon derives substantial revenues from its anticompetitive practices, and as such, the Demand Board would necessarily have to have been aware of these improper practices. Former director Tom Alberg, who served as a director on the Board from June 1996 until May 2019, described integrating TPSs into Amazon's e-commerce business as "one of Amazon's most important innovations." Tom Alberg, Flywheels: How Cities Are Creating Their Own Futures 113 (2021). Furthermore, a book written by Alberg cited Defendant Bezos's July 2020 congressional testimony regarding antitrust issues. *Id.* 347 n.6. Moreover, the DOJ was well aware of the Company's anticompetitive practices by March 9, 2022, and media outlets reported that as of April 6, 2022, the SEC Probe was already well underway and had been for more than one year.

203. Each member of the Demand Board knew the Company was misrepresenting the truth about long-term plans for expanding the warehouses and other delivery infrastructure for the Company's e-commerce business.

204. The Board approved Amazon's gigantic and bold expansion of the infrastructure, including real estate, for its e-commerce business. Reflecting on Amazon's expansion, Defendant

---

[23] 2022 Proxy Statement, at p. 86.

Stonesifer revealed:

> A lot of wise people said [that] to meet same-day delivery plus recover from the pandemic, plus address this extraordinary growth and have the customer experience we want, we need more capacity fast, and **we held hands and did it**.[24]

205.    On or about May 25, 2022, Dave Clark, the head of Amazon's consumer e-commerce business, presented to the Board (including the Demand Board) a three-year plan for fixing Amazon's overzealous expansion of its e-commerce business.[25]   According to the Wall Street Journal, the Board and Defendant Bezos "were enthusiastic about the plan."

206.    Defendants Bezos and Jassy (who are both part of the Demand Board) are named as Defendants in the Securities Class Action alongside Olsavsky, Zapolsky, and Sutton, who are also Defendants in this action.

207.    Accordingly, the Demand Board faces a substantial likelihood of liability for their breaches of fiduciary duties, making any demand upon them futile.

208.    Additionally, the Audit Committee Defendants at all relevant times, had specifically defined duties to properly oversee: (i) the integrity of the Company's publicly reported financial statements, press releases, and guidance; (ii) its system of internal, financial, and administrative controls; and (iii) the Company's compliance with legal and regulatory requirements, including risk management policies and consumer privacy violation risks.  Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing and failing to correct the improper conduct detailed herein.

209.    For these reasons, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties, making any demand upon them futile.

210.    Additionally, the Nominating and Corporate Governance Defendants—who have "experience in emerging technologies and public policy"—at all relevant times specifically reviewed risks of Amazon's Rekognition facial recognition technology in operation and actions to

---

[24] Dana Mattioli, *Amazon CEO Andy Jassy's First Year on the Job: Undoing Bezos-Led Overexpansion*, Wall Street Journal, available at https://www.wsj.com/articles/andy-jassy-amazon-bezos-overexpansion-11655383388 (June 16, 2022) (emphasis added)

[25] Dana Mattioli, *Amazon CEO Andy Jassy's First Year on the Job: Undoing Bezos-Led Overexpansion*, Wall Street Journal, available at https://www.wsj.com/articles/andy-jassy-amazon-bezos-overexpansion-11655383388 (June 16, 2022).

resolve or mitigate those risks, as part of their duty to oversee the Company's ethical business practices. Thus, the Nominating and Corporate Governance Defendants were responsible for knowingly or recklessly allowing and failing to correct the improper conduct detailed herein.

211. For these reasons, the Nominating and Corporate Governance Defendants face a substantial likelihood of liability for their breaches of fiduciary duties, making any demand upon them futile.

212. The Demand Board is aware of Amazon's violations of law as detailed herein. Fiduciaries of a Delaware Corporation cannot be loyal to a Delaware corporation by knowingly causing it to seek profit by violating the law. Each of the Directors face a substantial likelihood of personal liability for breaching their duty of loyalty, among many other duties.

213. In the face of the knowing and continuing violations of law, each of the Directors has failed to act, both to remedy illegal conduct and to apprise shareholders of the risks attendant to Amazon's conduct, demonstrating a conscious disregard for their responsibilities and failing to discharge their fiduciary duty of loyalty in good faith.

## C. DEMAND IS EXCUSED FOR ADDITIONAL REASONS

214. Demand is futile because the Demand Board is dominated and controlled by Defendant Bezos because of his immense influence as founder of the company and long tenure as CEO. Defendant Bezos built Amazon into one of the largest and most profitable companies in the world and as of 2022 controlled voting power for about 13% of outstanding shares in the Company. Indeed, one of Amazon's leadership principles is: "Leaders are right a lot." *See* https://www.amazon.jobs/content/en/our-workplace/leadership-principles.

215. The Board's inaction in the face of Amazon's governance failures and corporate misconduct can be explained by the Board's deference to Amazon's founder, Defendant Bezos. Bezos controlled (and continues to control) the Board. In 2019, former Director Tom Alberg described how Bezos dominated Board meetings: "At internal meetings, including board meetings, Jeff does not hesitate to use his powerful intellect or position to dominate a discussion of an issue, but he can also be a careful listener looking for new ideas." Tom Alberg, Flywheels: How Cities Are Creating Their Own Futures 110 (2021). Alberg added that Bezos once told him, "If I get one

good new idea out of every board meeting, it is a success." *Id.* Bezos championed the unlawful business practices described herein, and unsurprisingly, the Board has followed him in approving and/or failing to act in the face of improper privacy practices across the Company's divisions, antitrust misconduct in the Company's e-commerce business, and related public misstatements to investors.

216. The Demand Board members are likewise conflicted and unable to pursue the Company's claims against the Officer Defendants. Any effort to directly prosecute such claims against the Officer Defendants for their direct roles in the violations of applicable law carried out in Amazon's name would necessarily expose the Board's own culpability for the very same conduct. In other words, given that the Demand Board was required to be regularly informed concerning the Company's public reporting, outlook, controls, and employment decisions with respect to the Company's most senior officers, any effort by the Board to hold the Officer Defendants liable would lead the Officer Defendants to defend on the ground that their own conduct was consistent with corporate policy and practice, as established by and known to the Demand Board.

217. Moreover, the acts complained of constitute violations of the fiduciary duties owed by Amazon's officers and directors, and these acts are incapable of ratification. Despite having knowledge of the claims and causes of action raised by Plaintiffs, the Demand Board has failed and refused to seek to recover on behalf of the Company for any of the wrongdoing alleged by Plaintiffs herein.

218. When describing his and the Amazon Board's focus during an interview recorded on August 15, 2019, Rubinstein downplayed his (and other Amazon Board members') fiduciary duties: "The beauty of the Amazon board is you spend all—[*waving his hand in a dismissive gesture*] I mean, you have to do your fiduciary duty. You do all the stuff you got to do for the shareholders, SEC, all that kind of stuff, but you spend the bulk of your time thinking about what's the future and where is the company going. And it's great, so...."[26]

---

[26] *See* https://www.youtube.com/watch?v=47bNpIbCaL8&t=7423s, transcribed at https://archive.computerhistory.org/resources/access/text/2020/02/102717908-05-01-acc.pdf

219. Additionally, the individuals who comprise the Demand Board have longstanding personal, professional, and commercial relationships among each other and/or with Amazon that prevent them from exercising independence and independent judgment.

***Additional Reasons Demand is Excused as to Defendant Alexander***

220. Defendant Alexander's company depends on Amazon, specifically, AWS, and has a close commercial relationship with it. He founded cybersecurity company IronNet, Inc. in 2014 and is its CEO as well as Chairman. IronNet is an Amazon Web Services Partner.[27] IronNet's two primary platforms rely on AWS, which plays a key role in the platform's resilience, security, and features.[28] In June 2021, Amazon Web Services recognized IronNet as the "Best Cybersecurity Solution for Public Sector Organizations."[29]

221. 68% of IronNet's revenues for its Collective Defense platform for the year ended January 31, 2022 came from "deployments involving [IronNet's] key public cloud providers Amazon Web Services and Microsoft Azure."[30] IronNet later disclosed: "Our Collective Defense platform is a subscription-based pricing and flexible delivery model, with 83.6% of our revenue for the fiscal year ended January 31, 2023 related to deployments involving our key partner, Amazon Web Services."[31]

222. One of IronNet's software capabilities launched during 2022, IronRadar, is an annual subscription "sold directly from the AWS Marketplace.

223. In an interview on March 23, 2021, Alexander praised the Amazon Board:

> Well I'll tell you what an honor and privilege it is to be on the board, they have great people, they do a great job. I love the way the board works, the way they ask questions, everybody's well, really well prepared for this it's a, it's an honor to be on there. And they go through these processes and they want to do it right, I'm just really impressed with that.[32]

---

[27] https://partners.amazonaws.com/partners/001E000001N6xoJIAR/IronNet%20Cybersecurity%2C%20Inc

[28] IronNet, Inc., Quarterly Report EX-99.1 (Form 8-K) (Report commissioned and utilized by management of prospective acquirer of IronNet)

[29] https://www.businesswire.com/news/home/20210623005451/en/IronNet-Wins-Major-Amazon-Web-Services-AWS-Global-Award

[30] IronNet, Inc., Quarterly Report EX-99.1 (Form 8-K) (Nov. 14, 2022).

[31] IronNet, Inc., Annual Report (Form 10-K) (May 16, 2023).

[32] IronNet, Inc., Prospectuses and communications, business combinations (Form 425) (March 25, 2021).

224.    Therefore, Defendant Alexander cannot assess a claim independently and disinterestedly because of his business ties.

***Additional Reasons Demand is Excused as to Defendant Cooper***

225.    Since 2018, Cooper has served as a member of the Museum Council of the Smithsonian National Museum of African American History and Culture.  Stonesifer was a member of that same Museum Council from 2012 to 2020 and remains an emeritus member of it.

***Additional Reasons Demand is Excused as to Defendant Gorelick***

226.    Gorelick has become particularly deferential to Jassy, Bezos's handpicked successor.  Describing Mr. Jassy's suitability as Amazon's new CEO, Defendant Gorelick gushed: "For this moment in our corporate history, ***he's perfect***."[33]

227.    Gorelick is a partner at the law firm Wilmer Cutler Pickering Hale and Dorr LLP. Her firm webpage prominently touts her experience frequently counseling boards on governance issues, as well as her position as a Director of Amazon.com and chair of the Nominating and Governance Committee of the Board.  Gorelick would be unable to independently consider a claim against a fellow director or officer of Amazon because she would be swayed by her desire that boards retain her to represent them, which boards would be unwilling to do if she approves litigation against a director or officer.

***Additional Reasons Demand is Excused as to Defendants Huttenlocher and Weeks***

228.    Huttenlocher and Weeks have a longstanding, close relationship from their leadership positions at Corning Corporation.  In April 2005, Weeks was named chief executive officer of Corning Corporation and chairman of the board in April 2007.  Huttenlocher joined Corning Corporation's Board in February 2015 as a director.

229.    Further, Corning Incorporated is working with Amazon to provide private multi-access computing for enterprises.  On April 5, 2021, AWS announced how Weeks' company was using AWS's services in a post:

Corning recently installed an AWS Outposts rack that places the power of the AWS

---

[33] Dana Mattioli, *Amazon CEO Andy Jassy's First Year on the Job: Undoing Bezos-Led Overexpansion*, Wall Street Journal, available at https://www.wsj.com/articles/andy-jassy-amazon-bezos-overexpansion-11655383388 (June 16, 2022) (emphasis added).

HERMAN JONES LLP
15113 Washington Ave. NE
Bainbridge Island, WA 98110

cloud within the four walls of its optical cable plant in Hickory, North Carolina. The AWS capabilities that Outposts delivers, combined with the ultra-low latency, high throughput of the private 5G network, provide a powerful platform upon which Corning will innovate with applications never before possible, such as real-time analysis of large volumes of high-resolution video streams from across the factory and integration of high-data-rate automation systems.[34]

230. The business relationship with Amazon was significant enough for Weeks' company to highlight it in a press release about Corning's first quarter of 2021. *See* Corning Incorporated, Current Report (Form 8-K) (April 27, 2021) ("Corning's fiber optic cable manufacturing facility in Hickory, North Carolina, is leveraging Verizon 5G Edge with Amazon Web Services to explore how 5G can reshape manufacturing.")

231. Since 2019, Huttenlocher's primary occupation is as the dean of the Massachusetts Institute of Technology Schwarzman College of Computing. The material impact of Huttenlocher's compensation from being an Amazon Board member makes him unable to assess a claim independently and disinterestedly.

232. Defendant Nooyi served as a full-term member of the MIT Corporation – MIT's board of trustees – from 2020 to 2022.

***Additional Reasons Demand is Excused as to Defendant Rubinstein***

233. In an interview on August 15, 2019, Rubinstein dismissed concerns about Amazon's antitrust violations, volunteering: "It's this monopoly thing is so crazy because they're just not, right? I mean, the thing about online sales, start there, right? I mean, you just switch to which website you go to. If you don't want to buy from Amazon, you switch to somewhere else. You buy it somewhere else…I mean, there is no lock-in. There's none" [35]

234. When asked about what it is like working with Bezos, Rubinstein acknowledged Bezos's billionaire status and, indicating the deference that status requires, said he has experience working and interacting with "crazy billionaires." In describing Bezos and Amazon management, Rubinstein raved: "He's so smart…He's very, very smart. He's very thoughtful… And he's got a

---

[34] *See* https://aws.amazon.com/blogs/industries/aws-and-verizon-expand-5g-collaboration-with-private-mec-solution/.

[35] *See* https://www.youtube.com/watch?v=47bNpIbCaL8&t=7423s, transcribed at https://archive.computerhistory.org/resources/access/text/2020/02/102717908-05-01-acc.pdf

very loyal team that's been with him a real long time, and they're very good at managing. They're very thoughtful about managing."[36]

235. Rubinstein is an advisor to the hedge fund PDT Partners. Describing his work advising the use of technology by hedge funds, Rubinstein said "I'm an-- a big AWS customer-- not big but I'm a reasonable-sized AWS customer. I'm on the Amazon board where I get to see AWS from the other side."

***Additional Reasons Demand is Excused as to Defendant Stonesifer***

236. Stonesifer and Bezos have a decades-long close personal friendship.

237. Stonesifer interceded to help Bezos and Bezos's non-profit, the Bezos Earth Fund, handle complaints from environmentalists when talks with climate organizations turned to issues of fair labor standards and became more complex, contentious.[37]

238. Stonesifer served as President and CEO of Martha's Table, a non-profit in Washington, D.C., from April 2013 to March 2019. Amazon, Bezos, the Bezos Family Foundation, and Bezos's parents have donated to Martha's Table.

239. Stonesifer has served as an adviser to the Bezos Day One Fund founded by Bezos, a $2 billion commitment to focus on making meaningful and lasting impacts in two areas: funding existing non-profits that help families experiencing homelessness and creating a network of new, non-profit tier-one preschools in low-income communities.

240. Stonesifer was aware of Amazon's plans to expand infrastructure for its e-commerce business. Afterward, her comments that "we held hands and did it" demonstrate deference to Bezos and Jassy, as well as fellow Board members involved.[38] She cannot be expected to give disinterested consideration to a demand to sue Bezos, management, or any members of the Board.

241. In June 2023, Bezos named Stonesifer the interim chief executive officer of The Washington Post, a newspaper owned by Bezos. She will also help Bezos identify a new

---

[36] *Id.*
[37] Brad Stone, Amazon Unbound: Jeff Bezos and the Invention of a Global Empire 403 (2022).
[38] https://www.wsj.com/articles/andy-jassy-amazon-bezos-overexpansion-11655383388

permanent CEO for his newspaper. In his memo to the newspaper's staff on the appointment of Stonesifer, Bezos called her a "longtime friend." Bezos added he "admire[s] her" and "[h]er skills, judgment, and character all stand out."

242.    Due to their decades-long friendship, Stonesifer is unable to independently assess a litigation demand against Bezos.

243.    Further, Stonesifer is not independent because she has personally made tens of millions of dollars from her investment in Amazon and compensation as a director. In a 2013 interview, Stonesifer stated she had not received a salary since working at Microsoft in 1996.[39] And Stonesifer acknowledged her position on the Amazon Board has "…enriched her beyond what [she] deserve[s] . . ."[40]

## X.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### Breach of Fiduciary Duties
### (Against the Director Defendants)

244.    Plaintiffs incorporate by reference and reallege each of the preceding paragraphs above as if fully set forth herein.

245.    The Director Defendants owed and owe Amazon fiduciary obligations. By reason of their fiduciary relationships, the Director Defendants specifically owed and owe Amazon the highest obligation of good faith, fair dealing, loyalty, and due care in the administration of the affairs of the Company, including, without limitation, the oversight of the Company's compliance with state and federal privacy as well as antitrust laws, rules, and regulations, in addition to the duty of candor and truthful disclosure with respect to their public statements.

246.    The Director Defendants also owed and owe Amazon fiduciary duties under state corporation law, which impose broad obligations on Defendants vis-a-vis the corporation and its individual stockholders.

247.    In addition, the Director Defendants have specific fiduciary duties as defined by the Company's corporate governance documents, including its Guidelines on Significant Corporate

---

[39] https://www.c-span.org/video/?316322-1/qa-patty-stonesifer
[40] *Id.*

Governance Issues, Code of Business Conduct and Ethics, and the charters of various Board committees, and principles that, had they been discharged in accordance with the Director Defendants' obligations, would have prevented the misconduct and the consequent harm to the Company.

248. Each Director Defendant violated his or her fiduciary duties by consciously causing, or consciously failing to prevent the Company from engaging in, the improper acts complained of herein.

249. The Director Defendants consciously breached their fiduciary duties and violated their corporate responsibilities in at least the following ways:

(a) Failing to ensure the Company's compliance with relevant legal and regulatory requirements;

(b) Failing to heed and take action upon red flags indicating violations of law across the Company and that the Company's internal controls to ensure compliance with applicable laws and regulations were inadequate;

(c) Failing to maintain an adequate system of oversight, accounting controls and procedures, disclosure controls, and other internal controls, which were necessary to prevent or promptly correct the improper statements made on the Company's behalf;

(d) Themselves affirmatively making, allowing to be made, and/or failing to correct improper statements in SEC filings and other public disclosures relating to the Company's operations, internal controls, legal proceedings and risks (including financial, operational, legal, regulatory and enforcement, risks);

(e) Awarding Amazon's senior executives lavish compensation packages, despite their knowledge of and responsibility for the Company's willful misconduct; and

(f) Reappointing the same directors who had failed in their duties to the Audit Committee and Nominating and Corporate Governance Committee.

250. As a direct and proximate result of the Director Defendants' breaches of their fiduciary obligations, Amazon has sustained significant damages. Accordingly, the Director Defendants are liable to the Company.

HERMAN JONES LLP
15113 Washington Ave. NE
Bainbridge Island, WA 98110

251. Plaintiffs, on behalf of Amazon, have no adequate remedy at law.

## SECOND CAUSE OF ACTION
### Breach of Fiduciary Duties
### (Against the Officer Defendants)

252. Plaintiffs incorporate by reference Paragraphs 1 through 243.

253. The Officer Defendants owed fiduciary duties to Amazon and its stockholders. By reason of their positions as fiduciaries to the Company, the Officer Defendants owed duties of good faith, loyalty, candor, and truthful disclosure. In addition, the Officer Defendants have specific fiduciary duties as defined by the Company's corporate governance documents, including its Code of Business Conduct and Ethics, and principles that, had they been discharged in accordance with the Officer Defendants' obligations, would have prevented the misconduct and the consequent harm to the Company.

254. The Officer Defendants violated these duties by issuing, causing to be issued, or otherwise allowing the material omissions and misrepresentations described herein. The Officer Defendants were well aware of the relevant privacy and antitrust laws, rules, and regulations.

255. The Officer Defendants consciously breached their fiduciary duties and violated their corporate responsibilities in at least the following ways:

(a) Failing to ensure the Company's compliance with relevant legal and regulatory requirements;

(b) Engaging in a course of action which lead to violations of the law and regulations;

(c) Themselves affirmatively making, allowing to be made, and/or failing to correct improper statements in SEC filings and other public disclosures relating to the Company's operations, internal controls, legal proceedings and risks (including financial, operational, legal, regulatory and enforcement, risks); and

(d) Failing to implement and maintain adequate internal controls to ensure that adequate management and disclosure of risks.

256. As a direct and proximate result of the Officer Defendants' breaches of their fiduciary obligations, Amazon has sustained significant damages. Accordingly, the Officer

Defendants are liable to the Company.

257.    Plaintiffs, on behalf of Amazon, have no adequate remedy at law.

### THIRD CAUSE OF ACTION
#### Waste of Corporate Assets
#### (Against the Individual Defendants)

258.    Plaintiffs incorporate by reference Paragraphs 1 through 243.

259.    As a result of the misconduct described above, the Individual Defendants have wasted corporate assets by forcing the Company to expend valuable resources in defending itself in the ongoing litigation and investigations detailed herein, in addition to any ensuing costs from a potential settlement or adverse judgment or any penalties, fines, or other monetary penalties imposed related thereto.

260.    Further, as a result of the failure to allow the Company to implement adequate internal and financial controls, the Individual Defendants have caused Amazon to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duties.

261.    As a result of their waste of corporate assets, Individual Defendants are liable to the Company.

262.    Plaintiffs, on behalf of Amazon, have no adequate remedy at law.

### FOURTH CAUSE OF ACTION
#### Unjust Enrichment
#### (Against the Individual Defendants)

263.    Plaintiffs incorporate by reference Paragraphs 1 through 243.

264.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Amazon.  The Individual Defendants were unjustly enriched because of the compensation and remuneration they received while breaching fiduciary duties owed to the Company.

265.    Plaintiffs, as stockholders and representatives of Amazon, seek restitution from the Individual Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, severance payments, and other compensation obtained by the Individual Defendants, and each of them, in connection with, from or at the time of their wrongful conduct and fiduciary

HERMAN JONES LLP
15113 Washington Ave. NE
Bainbridge Island, WA 98110

breaches.

266.     Plaintiffs, on behalf of Amazon, have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A.     Finding that a stockholder demand on the Amazon Demand Board would have been a futile and useless act;

B.     Finding that the Individual Defendants breached their fiduciary duties to the Company, wasted corporate assets, and were unjustly enriched;

C.     Finding against each Individual Defendant in favor of Amazon for the amount of damages sustained by Amazon, jointly and severally, in an amount to be determined at trial, together with pre- and post-judgment interest at the maximum legal rate allowable by law;

D.     Requiring the Individual Defendants to return to Amazon all compensation and remuneration of whatever kind paid to them by the Company during the time that they were in breach of their fiduciary duties;

E.     Directing Amazon to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Amazon and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation, and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.     a proposal to strengthen the Company's controls and monitoring of compliance with anticompetition, antitrust, and privacy laws, including BIPA;

2.     a proposal to strengthen the Company's controls over accounting and financial reporting;

3.     a proposal to strengthen the Board's supervision of operations (including research & development along with third-party contracts) and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

4.    a proposal to strengthen Amazon's disclosure controls to ensure material information is adequately and timely disclosed to the SEC and the public;

5.    a provision to permit the stockholders of Amazon to nominate at least three candidates for election to the Board;

6.    a proposal to appoint additional independent board members with established reputations in the IT/biometrics industry and with substantial experience in governance, risk, compliance, cybersecurity, and consumer privacy issues;

7.    a proposal to enhance and/or augment the audit, risk and compliance committees of the Board to oversee internal controls and compliance processes;

8.    a proposal to ensure that the Chief Compliance, Risk and Legal Officer(s) and other company leadership have (a) necessary subject matter and regulatory expertise; (b) direct reporting authority to the Board; and (c) adequate autonomy and resources to carry out their responsibilities;

9.    a proposal to review and implement revised codes of conduct, policies and procedures, training, integrity hotlines, auditing and monitoring processes and procedures;

10.    a proposal to review and implement policies and procedures for escalating internal and regulatory issues internally and to the Board;

11.    a proposal to review and implement the confidential reporting structure and investigative process of complaints within the company;

F.    Directing Defendants to establish, maintain, and fully fund effective corporate governance and compliance programs to ensure that Amazon's directors, officers, and employees do not engage in wrongful or illegal practices;

G.    Granting additional appropriate equitable and/or injunctive relief to remedy the Individual Defendants' misconduct, as permitted by law;

H.    Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees and expenses; and

I.    Granting such other and further relief as this Court deems just and equitable.

# JURY DEMAND

Plaintiffs demand a trial by jury as to all issues so triable.

Respectfully submitted, this 14th day of July, 2023.

*/s/ Gregory F. Wesner*

Gregory F. Wesner, WSBA No. 30241

HERMAN JONES LLP
15113 Washington Ave NE
Bainbridge Island, WA 98110
Tel.: (206) 819-0821
gwesner@hermanjones.com

John C. Herman
Candace N. Smith
3424 Peachtree Road NE, Suite 1650
Atlanta, GA 30326
Tel.: (404) 504-6500
jherman@hermanjones.com
csmith@hermanjones.com

Michael I. Fistel, Jr. (pro hac vice)
JOHNSON FISTEL, LLP
40 Powder Springs Street
Marietta, GA 30064
Tel.: (470) 632-6000
Fax: (770) 200-3101
michaelf@johnsonfistel.com

Frank J. Johnson (pro hac vice)
JOHNSON FISTEL, LLP
501 West Broadway, Suite 800
San Diego, CA 92101
Tel.: (619) 230-0063
Fax: (619) 255-1856
frankj@johnsonfistel.com

*Co-Lead Counsel for Plaintiffs*

DocuSign Envelope ID: 35368731-6852-4951-AFAB-6A8E92411CF2

1
2

**<u>VERIFICATION</u>**

3
4
5
6

      I, Francis Gimbel Jr., hereby verify that I am familiar with the allegations in the Consolidated Verified Stockholder Derivative Complaint ("Complaint"), and that I have authorized the filing of the Complaint and that the foregoing is true and correct to the best of my knowledge, information, and belief.

7

      Executed this 11 day of July, 2023.

8
9
10

DocuSigned by:

*Francis Gimbel Jr.*

AC03BD722C23453

Francis Gimbel Jr.

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>VERIFICATION</u>

I, Stephen G. Nelson, hereby verify that I am familiar with the allegations in the Consolidated Verified Stockholder Derivative Complaint ("Complaint"), and that I have authorized the filing of the Complaint and that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed ____7/13/2023____.

DocuSigned by:

_____
DB7E319A6BAA461...
Stephen G. Nelson